## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**NICOLE WALLACE**
*Individually and as the Parent and*
*Next Friend of Daquan M. Wallace*
6507 Rosemont Avenue
Baltimore, Maryland 21206

and

**DAQUAN M. WALLACE**
6507 Rosemont Avenue
Baltimore, Maryland 21206

    *Plaintiffs*,

    **vs.**

**STEPHEN T. MOYER**
*Secretary of Public Safety*
*And Correctional Services*
300 East Joppa Road, Suite 1000
Towson, MD 21286

and

**BETTY JOHNSON**
*Former Baltimore City*
*Detention Center Warden*
300 East Joppa Road, Suite 1000
Towson, MD 21286

and

**LIEUTENANT TAMARA PATTERSON**
*Former Baltimore City Detention Center*
*Corrections Officer*
300 East Joppa Road, Suite 1000
Towson, MD 21286

and

**\* Jury Trial Demanded**

Civil Case No. CCB-17-3718

**EXHIBIT 1**

**OFFICER JACKENS RENE**
*Former Baltimore City Detention Center*
*Corrections Officer*
3464 Laurel Grove Road, Apt. 6B
Federalsburg, Maryland 21632

and

**OFFICER ERICKA N. SHIRD**
*Former Baltimore City Detention Center*
*Corrections Officer*
2506 Edgecombe Circle N, Apt. E
Baltimore, Maryland 21215

and

**SERGEANT LISA PORTEE**
*Former Baltimore City Detention Center*
*Corrections Officer*
3206 Wisteria Avenue
Baltimore, Maryland 21214

> *Defendants.*

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW, Plaintiffs, Nicole Wallace, individually and as Parent and Next Friend of Daquan M. Wallace, and Daquan M. Wallace, by and through counsel, Cary J. Hansel, Erienne A. Sutherell, and the law firm Hansel Law, P.C., and brings this action against Defendants: Stephen T. Moyer, Secretary of Public Safety and Correctional Services; Betty Johnson, former Warden of Baltimore City Detention Center; Lieutenant Tamara Patterson, former Correctional Officer of Baltimore City Detention Center; Jackens Rene, former Correctional Officer of Baltimore City Detention Center; Ericka Shird, former Correctional Officer of Baltimore City

Detention Center; Lisa Portee former Correctional Officer of Baltimore City Detention Center; and as cause therefore states the following:

## INTRODUCTION

1.      This action is brought by Plaintiff Daquan M. Wallace ("Mr. Wallace" or "plaintiff") as a result of the brutal attack he suffered while in custody at the Baltimore City Detention Center, rendering him permanently disfigured and disabled. The facility's Correctional Officers knowingly allowed *and assisted in* facilitating the heinous assault by other inmates against Mr. Wallace, and further assisted in the covering up of the attack.

2.      The attack was a result of Mr. Wallace's resistance to the Black Guerilla Family gang ("BGF" or "gang") which was operating inside of the Baltimore City Detention Center ("Detention Center" or "BCDC").  Mr. Wallace refused to join the gang while in custody at the Detention Center as a pre-trial detainee inmate, being held on an excessive $75,000 bail while awaiting trial for the non-violent charges pending against him.

3.      The violent acts against Mr. Wallace occurred in the context of Detention Center Correctional Officers being routinely involved in criminal activity within the facility and supporting the proliferation of gang related conduct occurring within its walls.  Supervisory staff and administrators not only turned a blind-eye to the behavior, but participated in it, which allowed the violence not only to continue, but effectively run rampant.

4.      Administrators and officials were well aware of the atrociously violent acts taking place within the Detention Center based upon numerous complaints,

3

reports of misconduct, and internal investigations, but failed to do anything to correct the misconduct, often times directly participating in it.

5.     By 2013, it was notoriously known that the Detention Center had succumbed to the leadership of the Black Guerrilla Family gang after the U.S. Attorney's Office for the District of Maryland, pursuant to an on-going investigation, indicted twenty-seven (27) of the DPSCS Correctional Officers working at the Detention Center.  The various criminal charges against the employees stemmed from their gang-affiliated conduct within the facility while working directly with/ for gang member inmates.  Notably, this indictment occurred nearly eighteen (18) months prior to the specific facts which give rise to this case, providing notice to the Defendant Administrators of the Defendant Officers unlawful actions

6.     Administration did not, however, take action, and following the indictments, conditions within the Detention Center worsened under the gang-related leadership.  Abusing their positions of leadership and authority, Correctional Officers within the Detention Center worked in tandem with gang members, while violent hazing ensued and inmates who refused to join the BGF gang were routinely tortured while under the supervision of Correctional Officers.  Reports were received of Correctional Officers paying gang member inmates to abuse and assault other non-gang member inmates.  Also included in numerous reports are incidents in which corrections officers raped inmates and refused inmates their necessary medical treatment.

7.     It was not until Governor Larry Hogan, in July of 2015, called for the closure of the facility that those subjected to the Detention Center's hostile and unsafe

conditions received any reprieve.  In a public address, Governor Hogan stated, "The Baltimore City Detention Center is a disgrace, and its conditions are horrendous. Ignoring it was irresponsible and one of the biggest failures of leadership in the history of the state of Maryland."

8.    The Detention Center's closure in August of 2015 came too late for many of those in custody who had already suffered irreversible harm from the facility's conditions, especially Mr. Wallace, who will be permanently disfigured and disabled due to the negligent, willful, reckless, and malicious treatment he was subjected to by the Defendants.

## JURISDICTION AND VENUE

9.    Jurisdiction is proper in this Honorable Court under 28 U.S.C. Code § 1331 because this is a civil action arising under the Constitution, laws, or treaties of the United States.  Plaintiffs further invoke supplemental jurisdiction of this Court to hear and decide claims arising under state law, by virtue of 28 U.S.C. § 1367.

10.    Venue is proper in this Honorable Court under 28 U.S.C. § 1391 because the parties are domiciled in Maryland, or organized under Maryland law, and the events at issue took place in Baltimore, Maryland.

Plaintiff timely filed proper notice under the Maryland State Tort Claims Act and Local Government Tort Claims Act and is in full compliance with said Acts.

## PARTIES

11.    Plaintiff, Nicole Wallace, is and was at all times relevant to the

occurrence complained of herein, an adult citizen of the United States and a resident of Baltimore City, Maryland.

12.     Plaintiff Daquan M. Wallace is and was at all times relevant to the occurrence complained of herein, an adult citizen of the United States and a resident of Baltimore City, Maryland.

13.     Defendant Stephen T. Moyer ("Defendant Moyer") is an adult citizen of the United States and currently serves as the Secretary of Public Safety and Correctional Services, and who stands in the shoes of all of his predecessors for the purposes of this case, whose conduct referred to herein was at all times relevant to his employment, and who is responsible for the pattern and practice of misconduct discussed herein and was at all times relevant hereto acting under color of state law. Defendant Moyer had the capacity and authority to hire, fire, and supervise final policymakers, including all individually named defendants herein.

14.     Defendant Betty Johnson is an adult citizen of the United States and at all times relevant hereto was the Warden for the Baltimore City Detention Center whose conduct referred to herein was at all times relevant to her employment, and who is responsible for the pattern and practice of misconduct discussed herein and was at all times relevant hereto acting under color of state law.  Defendant Johnson had the capacity and authority to hire, fire, and supervise final policymakers, including all individually named defendants herein.

15.     Defendant Officer Lieutenant Tamara Patterson is an adult citizen of the United States and at all times relevant hereto was a Correctional Officer for the Baltimore City Detention Center whose conduct referred to herein was at all times

relevant to his employment, and who is responsible for the pattern and practice of misconduct discussed herein and was at all times relevant hereto acting under color of state law.

16.     Defendant Officer Jackens Rene is an adult citizen of the United States and at all times relevant hereto was a Correctional Officer for the Baltimore City Detention Center whose conduct referred to herein was at all times relevant to his employment, and who is responsible for the pattern and practice of misconduct discussed herein and was at all times relevant hereto acting under color of state law.

17.     Defendant Officer Ericka Shird is an adult citizen of the United States and at all times relevant hereto was a Correctional Officer for the Baltimore City Detention Center whose conduct referred to herein was at all times relevant to her employment and who is responsible for the pattern and practice of misconduct discussed herein and was at all times relevant hereto acting under color of state law.

18.     Defendant Officer Sergeant Lisa Portee, is an adult citizen of the United States and at all times relevant hereto was a Correctional Officer for the Baltimore City Detention Center whose conduct referred to herein was at all times relevant to her employment, and who is responsible for the pattern and practice of misconduct discussed herein and was at all times relevant hereto acting under color of state law.

19.     Officers Jackens Rene ("Defendant Rene"), Officer Ericka Shird ("Defendant Shird"), Lieutenant Tamara Patterson ("Defendant Patterson"), and Sergeant Lisa Portee ("Defendant Portee"), are hereinafter collectively referred to as "Defendant Officers."

20.     All Defendants are jointly and severally liable for damages and injuries to the plaintiffs described herein.

21.     Defendant Betty Johnson ("Defendant Johnson") and Defendant Stephen T. Moyer ("Defendant Moyer"), collectively referred to as "Defendant Administrators," are and/ or were supervisory officials at the time of the acts described herein.

22.     All individually named defendants, Stephen T. Moyer, Secretary of Public Safety and Correctional Services; Betty Johnson, former Warden of Baltimore City Detention Center;  Lieutenant Tamara Patterson, former Correctional Officer of Baltimore City Detention Center; Jackens Rene, former Correctional Officer of Baltimore City Detention Center; Ericka Shird, former Correctional Officer of Baltimore City Detention Center; Lisa Portee former Correctional Officer of Baltimore City Detention Center, collectively referred to herein as "Defendants."

## STATEMENT OF FACTS

23.     On December 18, 2014, Daquan Wallace ("Plaintiff"), then only twenty years of age, was savagely attacked and beaten by other inmates while in custody at the Baltimore City Detention Center ("BCDC").

24.     Mr. Wallace was a non-violent offender who was 5'10" tall and weighed a mere 130 pounds.

25.     Within one-week of his commitment to BCDC, Mr. Wallace had complained to BCDC officials and Defendant Administrators' offices of being targeted for rape and fights as a result of not joining the BGF.

26.     An infirmary report dated just six days after his detention began notes "fight/ rape" being reported by Mr. Wallace and him resultingly being provided with HIV education.

27.     Mr. Wallace also informed his mother, Ms. Nicole Wallace ("Ms. Wallace"), that he had been the victim of violent physical attacks, detailing to her that some included 3 to 4 assailing gang members attacking him at once.

28.     Mr. Wallace explained to his mother that he refused to join the gang because he did not want to hurt anyone.

29.     The attacks on Mr. Wallace were so frequent and violent that he feared for his life.

30.     Ms. Wallace began reaching out to the Detention Center via telephone to advise officials and Defendant Administrators about the threats against her son.

31.     Upon information and belief, the Defendants were collectively aware of both Mr. Wallace's and Ms. Wallace's reports and acted in retaliation against Mr. Wallace for making complaints.

32.     On more than 6 occasions Ms. Wallace spoke with Detention Center staff and told them about the severity of Mr. Wallace's situation because of his refusal to join the gang, however, her pleadings with them to do something to protect her son were in vein.

33.     The Defendants were well aware of the risk of this type of attack as a consequence for prisoners who refused to join gangs.

34.     Defendant Shird has specifically acknowledged such risk by stating that detainees are attacked by gang members for refusing to join.

35.     Ms. Wallace continuously contacted officials and Defendant Administrators' offices at BCDC, speaking directly with Defendant Patterson on at least two occasions, advising of the severity of the danger that Mr. Wallace faced:

      a.   On or about November 5, 2014, Ms. Wallace spoke with Defendant Lieutenant Patterson ("Defendant Patterson") via telephone and advised Defendant Patterson of the death threats against Mr. Wallace being made because he would not join the BGF gang.  Ms. Wallace requested that her son be moved to protective custody.

      b.   On or about November 8, 2014, Ms. Wallace spoke with Defendant Warden Johnson via telephone and advised her of the death threats against Mr. Wallace being made because he would not join the BGF gang. Ms. Wallace again requested that her son be moved to protective custody.

      c.   On or about November 19, 2014, Ms. Wallace spoke with Defendant Patterson.  Defendant Patterson acknowledged injury to Mr. Wallace's eye and stated that she was concerned for his safety and would be moving him to protective custody.

36.     During a visit to the Detention Center in October 2014, Ms. Wallace observed bruising on Mr. Wallace.  He was unable to discuss it with her because of fear for his own safety.

37.     Despite the Defendants acknowledging visible injury and acknowledging that Mr. Wallace was in danger, Mr. Wallace was never moved to protected custody.

38.     At approximately 7:24 AM on December 2, 2014, just over two (2)
weeks prior to the attack described above, Mr. Wallace was medically treated for an
attack that he had sustained that morning, leaving him with bruising about his face
and left eye, a laceration to his lower lip, and a left shoulder abrasion.

39.     Defendants had allowed the attack by other inmates on Mr. Wallace to
occur by failing to intervene and turning a blind eye, leaving Mr. Wallace vulnerable
to the inmates whom Defendants knew were targeting him.

40.     Later that morning, at approximately 10:00 AM, on December 2, 2014,
Mr. Wallace was transported to the Baltimore City Courthouse for a pre-trial
conference.

41.     During transport, Defendants again allowed an attack on Mr. Wallace.

42.     Mr. Wallace was brought before the Honorable Judge Geller that
morning, and his attorney pled for a bail reduction so that Ms. Wallace could post bail
and protect her son from further harm.

43.     The Court acknowledged that Mr. Wallace had fresh cuts and bruising
on his face and it was apparent that Mr. Wallace was in danger.

44.     Mr. Wallace was bleeding from one eye while his other eye was nearly
swollen shut from the second beating he had sustained that day and because his vision
was blurry from the recent assault, Defendant Officers and other correctional officers
had to guide his walking as he was unable to see where he was going.

45.     Present in the courtroom were Ms. Wallace and Assistant Public
Defender Jerome LaCorte, who addressed the court on Mr. Wallace's behalf. Mr.
LaCorte expressed the severity of the conditions that Mr. Wallace faced while in

custody and pled with the court for intervention, or at a minimum, for a bail review hearing to take place that morning in the hopes of lowering Mr. Wallace's bail or releasing him on his own recognizance.  Unfortunately, the court refused to review bail.

46.     Later that day, at approximately 6:03 PM, Mr. Wallace reported to Defendants and other correctional officers that he had been hit in the eye and needed medical treatment as he was having difficulty seeing.

47.     Ms. Wallace called Detention Center officials and Defendant Administrators' offices that night to express her grave concern over her son's welfare, expressing that he was even subjected to assaults while in the presence of correctional officers from BCDC, but such communication, as she had previously experienced, had little to no effect.

48.     Ms. Wallace had been contacting the Detention Center for months to file complaints about the safety and well-being of her son.

49.     For the next two weeks, Ms. Wallace spoke with her son a handful of times, on each occasion, he stated that too many people were present to discuss his safety.

50.     During his detention, Mr. Wallace was assigned to the Jail Industries building (JI) at BCDC.

51.     On December 18, 2014, Officers Jackens Rene ("Defendant Rene"), Officer Ericka Shird ("Defendant Shird"), Lieutenant Tamara Patterson ("Defendant Patterson"), and Sergeant Lisa Portee ("Defendant Portee"), collectively caused Mr.

Wallace to be transferred from the J-Section of the "JI" Unit of housing to the "G" Section of MDC, for the purpose of subjecting him to the brutal attack.

52.     JI held fewer violent offenders and generally inmates with a lower security classification than other buildings, such as the more dangerous Men's Detention Center (MDC).

53.     During the morning of December 18, 2014 Correctional Officer Jackens Rene worked the "A Shift" at JI during which he interacted with Mr. Wallace.

54.     During the A Shift, Defendant Patterson claimed that a correctional officer working in the JI unit allegedly complained that Mr. Wallace was being "disrespectful" and not listening to officers and as a result, she determined that he should be transferred.

55.     No such complaint was ever made against Mr. Wallace.

56.     Defendant Patterson conspired with Defendant Rene—who was working in Mr. Wallace's housing unit—and Defendants Portee and Shird, to falsify paperwork to have Mr. Wallace moved to MDC.

57.     Defendant Patterson directed Defendant Portee to complete paperwork to have Mr. Wallace transferred citing fabricated allegations that Mr. Wallace was extorting other inmates for commissary and phone privileges.

58.     This allegation was undisputedly false and the Defendants knew that Mr. Wallace was never involved with extorting inmates, stealing from inmates, or anything of the kind.

13

59.     Defendant Patterson has since admitted that Mr. Wallace never committed extortion or anything of the sort.

60.     The Defendants also knew that no complaints or disciplinary actions had been filed against Mr. Wallace for insubordination towards correctional officers or BCDC staff.

61.     The transfer paperwork was falsified because there were no factual grounds to otherwise justify a transfer of Mr. Wallace.

62.     The Defendants further conspired to effectuate the transfer because they knew that even the false grounds that had been cited would not be approved as reason for the transfer of a detainee.

63.     Defendant Johnson has testified that a detainee would not be transferred in housing for allegations that a detainee is extorting other detainees for commissary.

64.     Defendants Shird and Rene have likewise testified that they knew that such an infraction would not be grounds for a transfer to MDC but rather, would result in a transfer to solitary.

65.     There was no reason for the transfer from the "JI" Unit of housing to the "G" Section of MDC other than to facilitate the subsequent beating and attempted rape of Mr. Wallace.

66.     The JI building had open dormitory housing which provided no privacy for long lasting attacks without numerous witnesses.

67.     Each dorm in JI was also supervised by two officers, which meant that no one officer could cooperate with gang members to permit an attack to occur without fear of discovery by the other officer.

68.     MDC offered BGF assailants the advantages of more private cells and the supervision of only a single officer per tier.

69.     MDC also had the advantage to the BGF of housing more violent gang members with higher security classifications.

70.     Mr. Wallace did not fall under this category of holding a higher security classification as he was a non-violent offender being held on a comparatively lower bail.

71.     The Defendants conspired together to have Mr. Wallace impermissibly transferred from the JI unit to the G section so that the inmates being housed there could rape and beat him.

72.     On December 18, 2014, after completing his first shift where Mr. Wallace was housed in the JI building, Defendant Rene was scheduled to work a second shift, the "B" shift, in the G section of MDC.

73.     Defendant Shird worked the "A" shift of the G-section of MDC on the day of the attack, and worked overtime hours that day so that she would have an overlapping shift with Defendant Rene.

74.     A transfer form is not valid without supervisory approval, including a valid signature by a traffic officer and authorization by a shift commander.

75.     The transfer form executed by the Defendants had neither a valid signature from a traffic officer or the authorizing signature of a shift commander.

15

76.     Executing a transfer without the required approvals would be grounds for discipline or termination.

77.     The transfer of a detainee using an invalid form would require the receiving officer to refuse the transfer.

78.     The parties involved in such a transfer would also have been reprimanded for engaging in a transfer without the shift commander's signature.

79.     Defendant Portee has admitted that she is unaware of any transfer ever having been performed without the appropriate signatures on the form.

80.     Defendant Rene, however, accepted the transfer of Mr. Wallace even though the transfer form did not contain a shift commander's approval or a valid signature from a traffic officer.

81.     The Defendants' willingness to go forward with the transfer establishes that the Defendants were working together from the outset.

82.     Defendants Patterson and Portee could only be sure that their facially-invalid transfer form would be accepted by MDC by conspiring with Defendants Rene and Shird to accept the transfer of Mr. Wallace with an invalid form.

83.     Defendants Patterson, Portee, Shird and Rene colluded to falsify grounds for the transfer and then failed to submit the transfer for approval, knowing full well that permission would have been denied even based on the falsified allegations.

84.     Defendant Rene has admitted knowing that Major Karen Moore, the shift commander, was supposed to sign off on the transfer paperwork, but that when it arrived with Mr. Wallace, her signature was missing.

85.     Once transferred to MDC, Defendant Rene signed off on the invalid transfer form and placed Mr. Wallace in his cell with his handcuffs still on.

86.     Mr. Wallace's new cellmate, Joseph Beatty, was immediately ordered out of the cell by Defendant Rene and told to leave early for dinner, with the rest of the tier being released approximately 5-10 minutes later.

87.     While the rest of the G-Section detainees went to dinner, Defendant Rene did not allow Mr. Wallace to be released, and instead, held him back along with the detainees from cells 3, 47, and 48.

88.     The detainees housed in cells 3, 47, and 48 were BGF members who worked in collusion with the Defendants.

89.     As confirmed by several witnesses, including his cellmate, Mr. Wallace did not go to dinner on December 18, 2014.

90.     It is against BCDC policy to allow detainees to stay back from dinner unless medically authorized.

91.     None of the detainees that Defendant Rene held back from dinner that day had any such medical authorizations.

92.     During the time that the rest of the G-Section tier was at dinner, Defendant Rene released the detainees of cells 3, 47, and 48 and personally opened, or caused Mr. Wallace's cell to be opened, to allow the detainees access to Mr. Wallace.

93.     Alternatively, Defendant Rene gave the keys to Defendant Shird, conspiring with Defendants Rene, Portee, and Patterson, who then opened Mr.

Wallace's cell door to allow the detainees of cells 3, 47, and 48 access to Mr. Wallace so that he could be beaten and raped.

94.     The cells of the G-Section could only be opened by the supervising correctional officer who had the keys to the cell doors.

95.     Defendant Rene had the keys to the cells during dinner and throughout his shift.

96.     Defendant Shird also worked in G-Section that day.

97.     While the rest of the G-Section was at dinner, the occupants of cells 3, 47, and 48 gruesomely beat Mr. Wallace and attempted to rape him, in front of Defendants Rene and Shird who had given them access by opening the cell doors.

98.     Defendants Rene and Shird were present for the horrific assault as they had to individually open the cells with BCDC issued keys.

99.     Defendant Rene provided false reports that Mr. Wallace went to dinner that evening.

100.     Defendant Rene further submitted reports stating that he twice walked cell to cell, looking directly into Mr. Wallace's cell while completing "rounds" while the G-Section detainees were at dinner to make sure that all of the cells were locked shut and secure.

101.     The cells at the detention center were designed such that there was nowhere to hide and an officer doing rounds cell to cell as Defendant Rene was would be able to observe whether the cell was occupied and where in the cell any occupants were located, including in the bed(s).

102.    Defendants Rene and Shird were able to view the entire attack on Mr. Wallace.

103.    Within minutes of when Defendant Rene claims to have completed a "round" —marking Mr. Wallace's cell as vacant and secured—the detainees of the G-Section arrived back from dinner.

104.    The lights on the G-Section had been turned out while the other detainees were arriving back from dinner so as to allow Defendant Rene and/ or Shird an opportunity to secure the inmates of cells 3, 47, and 48 back in their cells without notice.

105.    Some of the first arriving detainees heard the attack on Mr. Wallace as it was ending, noting that it could be heard throughout the tier.

106.    Upon arriving back from dinner, Mr. Wallace's cellmate found Mr. Wallace unresponsive in his bunk and immediately notified Defendant Rene.

107.    Blood was splattered on Mr. Wallace's cell wall next to his bunk, displaying that the attack occurred inside of his cell.

108.    Defendant Rene locked the detainees of cells 3, 47, and 48 back in their cells to conceal that they had been released to complete the attack on Mr. Wallace.

109.    The Medical Unit of BCDC responded to treat Mr. Wallace, finding that he had suffered from trauma to his head in multiple locations.

110.    Before the perpetrators of the beating could wash away evidence of the attack, the water on the tier was shut off.

111.    Bloody clothes were later found in cells 47 and 48.

19

112.    No other blood evidence was collected from any other cells besides cells 47, 48, and Mr. Wallace's cell.

113.    The fraudulent transfer occurred just prior to the attack, before Mr. Wallace had an opportunity to have any interaction with any of the inmates being housed in the G-Section of MDC.

114.    The timing of the attack, occurring almost immediately after Mr. Wallace's fraudulent transfer, demonstrates that it was planned in advance.

115.    There was not enough time for the planning and execution of the attack in the brief interval after Mr. Wallace's arrival in the G-Section until the attack occurred.

116.    Mr. Wallace did not have any interaction with his attackers prior to the day of the assault.

117.    Defendants Rene and/ or Shird permitted physical access for the attack to occur by ordering Mr. Wallace's cellmate to dinner early and opening both the assailants' cells and Mr. Wallace's cell.

118.    Then, Defendant Rene, who could see and hear the entirety of the attack during his rounds, allowed it to continue and subsequently kept the identities of the assailants secret.

119.    Because of Plaintiffs' prior reporting of unlawful misconduct, the Defendants retaliated and conspired with the perpetrators of the beating to ensure that it would take place, they further conspired to provide a cover-up for the inmate perpetrators *and* one-another by providing false and misleading information throughout the subsequent investigation of the incident.

120.     The Defendants worked together to falsify the transfer paperwork to have Mr. Wallace moved from JI to the G Section and collaborated with gang members so that the attack could occur while only under the supervision of the Defendants.

121.     The Defendants allowed the perpetrators of the attack to remain in the "G" Section, even though they were supposed to be transferred to the dining hall with the rest of the Section inmates.

122.     In an attempt to cover-up the attacks and further assist the perpetrators in the conspiracy, Defendants knowingly and falsely later reported that Mr. Wallace had exited to the dining hall during the time of the attack.

123.     The Defendants falsely claimed that Mr. Wallace left for the dining hall at 19:20 HRS, at which time, Defendant Rene claims to have secured Mr. Wallace's empty cell.

124.     Defendant Rene later falsely reported that the attack occurred outside of Mr. Wallace's cell while the detainees were returning from dinner.

125.     The attack occurred inside of Mr. Wallace's cell and the only way that the perpetrators had access to his cell was by Defendant Rene and/ or Shird opening Mr. Wallace's cell door.

126.     Mr. Wallace did not leave his cell for dinner, instead, he was left alone in his cell by the Defendants, as confirmed by his cellmate, so that other inmates could complete their attack on him.

127.     Defendants further retaliated against Mr. Wallace by failing to timely call for medical assistance.

128.    The attack that rendered Mr. Wallace near death, left blood splattered on the wall next to his bunk and on his clothing, swelling on his left ear and face, and open, bleeding, cuts on the back of his head.

129.    Eye witnesses to the attack confirm that Defendants Rene and Shird, both assigned to the "G" section on December 18, 2014, assisted in ensuring that the beating took place.

130.    On April 25, 2015, Defendant Warden Betty Johnson ("Warden Johnson") was approached by former inmate, Llyod Noonan, who confirmed the Defendants' involvement.

131.    On that same date, Warden Johnson e-mailed detective Mark Carter, the following:

"Today I was leaving the JI building on Madison Street when I was approached by an African American male. The individual addressed me as Warden Johnson. He asked me if they ever found out who killed the young boy on G-Section in December. I asked him his name but he refused to give it to me stating he was there when it happened but has since been released. I did not recognize the individual, however I believe I could recognize him if I saw again. He stated the boys Flatline, Meatball and D-Nice beat him up and put him back in his bed, He went on to say they are BGF. In addition, he went on to say Ofc. Sheraton was on the section and allowed these assaults and robberies to occur. Based on this information I had my intel Lieutenant Hines run the nicknames and see if they were listed in the data base and who was

22

working the section on the assault of the assault. Please see the lieutenants

response below…"

132.    Defendant Shird is "Ofc. Sheraton," which was a misspelling in

Warden Johnson's e-mail.

133.    Defendant Administrators knew about the Defendants' participation in

the attack against Mr. Wallace.

134.    There was no investigation into the Defendants' actions or

involvement.

135.    The lack of investigation into the allegations against the Defendant

Officers proves knowledge on the part of the Defendant Administrators and shows the

Defendants' collective complicity to the conduct described herein.

136.    The African American male referenced by Defendant Warden Johnson

was later confirmed to be Lloyd Noonan.

137.    The Defendants provided a false timeline to cover-up the true events

which led to Mr. Wallace's attack.

138.    The Defendants provided a false statement concerning review of

surveillance footage, alleging that nothing had been captured on video.

139.    The Defendants failed to properly supervise the facility and the

inmates housed there, and failed to properly perform the basic essential functions of

their duties, placing Mr. Wallace in the zone of danger.

140.    Mr. Wallace's near-lifeless body had been left inside of his cell after

the attack, face down, and was discovered later at which point Mr. Wallace, suffering

from his injuries, was non-responsive.

141.     When the Defendants finally addressed Mr. Wallace's condition, medical assistance on-site was of little help given his progressively worsening state and EMS personnel were called to respond to the scene.

142.     Mr. Wallace was taken to Johns Hopkins Hospital where he was treated for his injuries.

143.     The initial treatment notes reflect that Mr. Wallace sustained a traumatic brain injury, with visible trauma evident from swelling and bleeding of the left ear and left side of Mr. Wallace's face, human lips mark on the left anterior chest wall, and multiple traumas to the left neck.  In addition, a CT scan referenced a fracture to Mr. Wallace's inner eye socket.

144.     Mr. Wallace remained in a comatose vegetative state for nearly one month with a poor prognosis for any recovery.

145.     As a result of the attack, Mr. Wallace suffered a severe traumatic brain injury.  To this date, Mr. Wallace is unable to talk or walk, remains on a ventilator to assist in his breathing function, and requires daily twenty-four (24) care.

146.     Defendants knew of the severity of the dangerous circumstances that Mr. Wallace faced, as he had knowingly been previously targeted by BGF gang members within the BCDC and the threats against his life had been reported to them.

147.     The Defendants violated BCDC policy by completing fraudulent transfer paperwork citing false grounds for a transfer.

148.     The Defendants violated BCDC policy by effectuating a transfer with proper approvals.

149.   The Defendants violated BCDC policy by not placing Mr. Wallace in solitary confinement, where he would have been safe from the attack.

150.   The Defendants violated BCDC policy by leaving detainees in their cells during dinner.

151.   The Defendants violated BCDC policy by leaving Mr. Wallace in his cell while handcuffed.

152.   The Defendants violated BCDC policy by opening Mr. Wallace's cell door so that the detainees of cells 3, 47, and 48 could gain entry.

153.   The Defendants violated BCDC policy by not reporting the attack, despite having witnessed it in its entirety and knowing the identity of perpetrators.

154.   The Defendants violated BCDC policy by not timely calling for medical assistance.

155.   On December 18, 2014, Ms. Wallace received a phone call advising her that she needed to respond to Johns Hopkins Hospital.  The caller would not provide any additional information.

156.   When she arrived to the hospital, Ms. Wallace learned that her son had been unconscious for nearly four hours, that he had been found in his cell face down, and was unresponsive.

157.   While at the hospital, Detention Center officers were present and hid their badges from Ms. Wallace to keep their name tags from her view.

158.   She was told by Detention Center staff that no photographs were to be taken while in the hospital.

159.     Five days passed from the date of the incident before Ms. Wallace heard from Detention Center personnel, at which time no additional information about the attack was provided to her.

160.     While in treatment, Mr. Wallace experienced bed sores, pneumonia, a tracheostomy tube for ventilation, and a feeding tube for nutrition.  To date, the feeding and tracheostomy tubes have been removed, but he is still unable to use his arms and legs, is confined to a chair, unable to talk or write, and undergoes intensive daily therapy.  The charges that he was facing which had placed him in confinement, ultimately weren't pursued.

161.     Defendants failed to protect, supervise, and otherwise perform their jobs as required, so as to appease gang member inmates and others involved in illicit activities, thereby participating in the corrupt and illegal conduct.

162.     Defendants' pattern of practice and conduct caused the brutal attacks on Mr. Wallace.

163.     Defendants failed to timely render aid to Mr. Wallace despite the means and duty to do so.  Defendant Officers have a duty to supervise and observe inmates, and are required to prevent, respond to, and report any incidents between inmates.

164.     Prior to the attack, Mr. Wallace had been committed to the Baltimore City Detention Center on September 3, 2014, for pending charges, as a pre-trial detainee inmate.  As of the incident date of December 18, 2014, more than three months after the initial charges, Mr. Wallace was still in custody for the same

pending, non-violent charges, being held on a seventy-five thousand ($75,000) dollar bail.

165.   Defendant Administrators failed to ensure that Defendant Officers were properly trained, and further, failed to adequately supervise Defendant Officers.

166.   Defendant Administrators oversaw—as well as participated in—the day-to-day operations of the BCDC, with their offices based within the facility.

167.   Despite knowing about the threats against Mr. Wallace's life and the specific danger that he was in, while knowing about the corruption within the facility, Defendant Administrators failed to take action and turned a blind eye.

168.   Defendant Administrators were deliberately indifferent towards Mr. Wallace's rights.

169.   Defendant Administrators failed to implement proper policies and procedures by failing to have two correctional officers assigned at all times to the oversight of housing units within BCDC, including the G-Section of MDC which housed in excess of ninety detainees of mostly high-risk offenders.

170.   Such failure resulted in housing units, including Mr. Wallace's, detaining in excess of ninety individuals, being inadequately supervised by only one correctional officer at a time.

171.   Defendant Administrators allowed this oversight to occur with the knowledge that corrupt correctional officers were working within BCDC and with the knowledge that attacks, such as the one on Mr. Wallace, could easily take place.

172.    Defendant Administrators knew that such failure would lead to correctional officers, including the Defendant Officers, having the opportunity to collude with BGF detainee gang members.

173.    Defendant Administrators failed to promulgate policies and procedures to ensure that security cameras were operable.

174.    Defendant Administrators knew that cameras within the facility were inoperable, thereby providing protection to the Defendant Officers and perpetrators of the attack on Mr. Wallace.

175.    Defendant Administrators failed to promulgate policies and procedures and otherwise properly train Defendant Officers to know that all detainees are required to exit their housing unit for dinner.

176.    Defendant Administrators failed to enact and enforce policies and procedures that would have effectively prevented collusion between correctional officers and inmates to cause harm to individuals, including Mr. Wallace.

177.    Defendant Administrators failed to terminate individuals as the result of misconduct, thereby promoting and furthering corruption within BCDC.

178.    Defendant Officers were the subordinates of the Defendant Administrators.

179.    Based upon the reports to their offices, the Defendant Administrators knew, or should have known, of the substantial risk of harm Mr. Wallace faced.

180.    Based upon the numerous federal indictments of their employees, such as Criminal Case No. ELH-13-0151, Defendant Administrators also had knowledge of the corruption and misconduct occurring at the hands of the Defendant Officers

and upon information and belief, had previously been deposed and participated in internal investigations concerning such conduct.

181.    As publicly reported, the BCDC was subject to several audits, which revealed the rampant misconduct and egregious conditions detainees were subjected to. (See Baltimore Sun, June 6, 2013 (explaining that investigations at the facility resulted in federal indictments of inmates and corrections officers accused of acting on behalf of BGF); Baltimore Sun, July 25, 2013 (providing testimony from one official stating that contraband was a visible issue)).

182.    Defendant Moyer oversees the entirety of the Department of Public Safety and Correctional Services ("DPSCS"), including nearly 12,000 employees.

183.    As the secretary of DPSCS, Defendant Moyer is by statute assigned the responsibility of carrying out policies as they relate to public safety, crime prevention, correction, parole, and probation.

184.    Despite their knowledge of the serious harm Mr. Wallace faced, and their knowledge of the Defendant Officers' BGF affiliations, Defendant Administrators were deliberately indifferent to Mr. Wallace's rights, failing to act and thereby ratifying the actions of the Defendant Officers.

185.    Defendant Administrators indifference towards Defendant Officers conduct, as demonstrated through their failure to investigate after the fact or take corrective action prior to the attacks on Mr. Wallace, amounted to tacit authorization of the Defendant Officers' misconduct.

186.    Such authorization not only allowed the attacks on Mr. Wallace to occur, but encouraged them, directly violating Mr. Wallace's rights.

187.    Defendants' actions in not moving Mr. Wallace to protective custody within BCDC were unreasonable.

188.    Defendants were on notice of the serious threats against Mr. Wallace's life and despite the knowledge that security precautions were necessary to safe-guard his well-being, failed to take corrective action, and instead, assisted in facilitating the attacks on Mr. Wallace.

189.    Defendants' failure to train, supervise, and discipline Defendant Officers directly caused the injuries suffered by Plaintiffs.

190.    Defendant Officers had Defendant Administrators' consent, authority, and ratification when they facilitated the attacks on Mr. Wallace.

191.    Defendant Administrators were policy making officials, and responsible for the operation and implementation of policies and procedures within BCDC.

192.    Defendant Administrators fostered and encouraged an environment of injustice and violations of constitutional rights, where Defendant Officers used their positions of authority to further unlawful assaults, attacks, and retaliation against detainees, such as Mr. Wallace.  Defendant Officers were therefore acting with the approval and ratification of Defendant Administrators when committing constitutional violations.

193.    Defendant Administrators had knowledge of the implementation of such policies and procedures, and despite this knowledge, acted with deliberate indifference to detainees' constitutional rights and failed to otherwise take action to correct such customs.

## COUNT I
## CIVIL RIGHTS ACT [42 U.S.C. § 1983]
**Fourteenth Amendment**

194.    Plaintiffs adopts and incorporate by reference each and every allegation contained elsewhere herein verbatim with the same effect as if herein fully set forth.

195.    Defendants engaged in an activity that violated Plaintiff's rights as protected under the Constitution of the United States, violating Mr. Wallace's Due Process rights.

196.    By the actions detailed herein, including, but not limited to: facilitating the attacks on Mr. Wallace, encouraging and failing to prevent the brutal attacks against Plaintiff, the covering up of the attacks against Plaintiff after their occurrence, and the failure to render aid to Plaintiff despite the means and duty to do so, Defendants deprived Plaintiff of his Constitutional rights under the Fourteenth Amendment, including, but not limited to:

   a.   freedom from imprisonment and seizure of freehold, liberty and privilege without due process, and without judgment of his peers;

   b.   freedom from the deprivation of liberty without due process of the law, and without the judgment of his peers;

   c.   freedom from the abuse of power by law enforcement and correctional officers;

   d.   freedom from summary punishment; and

    e.   freedom from prison officials' and employees' deliberate indifference to the health and safety of inmates and deliberate indifference to serious assaults by other inmates.

197.   Plaintiff has a right to be free from summary punishment by the Defendant Officers.  This right was denied to Plaintiff when Defendant officers knowingly allowed the brutal attacks by other correctional inmates against Plaintiff without legal cause, excuse or justification.

198.   Plaintiff has a protected property and liberty interest in his freedom, his ability to exercise his free will and domain over his person, his ability to be free from unlawful and unwelcome abuse and attack by prison employees and administrators, and his ability to practice his chosen profession and earn a living thereby.

199.   Plaintiff was deprived of numerous protected property and liberty interests by Defendants.

200.   Plaintiff's rights were denied when Defendant officers refused to timely render appropriate medical assistance to Plaintiff, despite the means and duty to do so.

201.   Plaintiff was afforded less process than was due under law by Defendants in depriving him of the rights in question.

202.   By the actions detailed above, Defendants deprived Plaintiff of his constitutional rights including, but not limited to, freedom from abuse of power by those acting under color of state law and authority.

203.    At all times relevant hereto, Defendants acted under color of State law and in a manner which was not objectively reasonable.

204.    Defendants had a duty to maintain security, prevent disturbances, and take reasonable measures to guarantee safety of detainees, to protect them from violence at the hands of other detainees.

205.    Defendants were deliberately indifferent to Mr. Wallace's safety.

206.    Defendants conduct subjected Mr. Wallace to atypical and significant hardships, in relation to the ordinary conditions for a pre-trial detainee.

207.    At no time relevant to this action, did Mr. Wallace engage in any criminal or illegal act, or act in violation of the policies, regulations, and procedures of BCDC.

As a direct and proximate result of the aforesaid conduct, actions and inactions of Defendants and that stated elsewhere herein, Plaintiff was caused to suffer and continues to suffer temporary and permanent physical injuries, physical pain and suffering, mental pain and suffering, including but not limited to, undue emotional distress, mental anguish, humiliation, embarrassment, loss of respect, shame, loss of enjoyment of life and disability, an inability to perform and enjoy his normal and usual activities, and economic damages including, but not limited to, past and future medical bills and expenses, past and future lost time and wages from work, past and future lost earning capacity and unnecessary attorneys' fees, all to the great detriment of Plaintiff.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00, plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial.

## COUNT II
## CIVIL RIGHTS ACT [42 U.S.C. § 1983]
### Fourth & Fourteenth Amendment

208.    The Plaintiffs adopt and incorporate by reference the allegations contained elsewhere herein with the same effect as if herein fully set forth.

209.    At no time relevant to this action was Mr. Wallace a threat to the safety of any Defendants, himself, or others.

210.    At no time did Mr. Wallace resist detention or attempt to evade detention by flight or otherwise.

211.    At the time of the events complained of herein, Mr. Wallace had a clearly established right to be secure in his person and free from summary punishment.

212.    Any reasonable correctional officer or administrator thereof knew or should have known of these rights at the time of the complained of conduct.

213.    Defendants acted unreasonably in their conduct towards Mr. Wallace, subjecting him to summary punishment and excessive force and violating his due process rights.

214.    Defendants were the direct cause of the constitutional violations suffered by Mr. Wallace, which caused near-death, serious bodily injury.

215.    Defendants orchestrated the beatings and attacks on Mr. Wallace, and are directly liable for the resulting conduct.

216.     Defendants participated in a conspiracy to exact serious bodily injury upon Mr. Wallace, and carried out such conspiracy to ensure that the injury occurred.

217.     None of the Defendants took reasonable steps to protect Mr. Wallace, and instead, acted to place him in the zone of danger.

218.     The acts or omissions of all Defendants were the direct causes of Mr. Wallace's resulting injuries.

219.     The individual Defendants  acted in concert and joint action with one another to intentionally deprive Mr. Wallace of his constitutional rights.

220.     At all relevant times herein, all Defendants were acting pursuant to custom, policy, decision, ordinance, widespread habit, practice, and usage in their actions against Mr. Wallace.

221.     As a direct and proximate result of the aforesaid conduct, actions and inactions of Defendants and that stated elsewhere herein, Plaintiff was caused to suffer and continues to suffer temporary and permanent physical injuries, physical pain and suffering, mental pain and suffering, including but not limited to, undue emotional distress, mental anguish, humiliation, embarrassment, loss of respect, shame, loss of enjoyment of life and disability, an inability to perform and enjoy his normal and usual activities, and economic damages including, but not limited to, past and future medical bills and expenses, past and future lost time and wages from work, past and future lost earning capacity and unnecessary attorneys' fees, all to the great detriment of Plaintiff.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00, plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial.

**COUNT III**
**CIVIL RIGHTS ACT [42 U.S.C. § 1983]**
**Eighth Amendment**

224.    The Plaintiffs adopt and incorporate by reference the allegations contained elsewhere herein with the same effect as if herein fully set forth.

225.    As alleged herein, Defendants maintained a policy and practice of denying rights to detainees within the BCDC.

226.    Defendants' actions, intentionally promulgated and executed for unlawful reasons, i.e., for furtherance of BGF Gang criminal activity, were done in complete disregard for the medical and safety needs of Mr. Wallace.

227.    Mr. Wallace was detained under conditions which posed a substantial risk of harm.

228.    Defendants knew of and completely disregarded the risk posed to Mr. Wallace.

229.    Mr. Wallace was deprived of the minimal civilized measure of life's necessities by the Defendants, who alternatively, deliberately placed Mr. Wallace in substantial risk of serious harm.

230.    Defendants were deliberately indifferent to Mr. Wallace's serious medical conditions.

231.    Defendants were aware of facts from which the inference could be drawn that a substantial risk of harm existed.

232.     By facilitating and assisting in the assaultive attacks and beatings exacted upon Mr. Wallace, Defendants deprived him of his right to be free from cruel and unusual punishment.

233.     Defendants engaged in the conduct described herein in bad faith, maliciously, willfully, and in reckless disregard to Mr. Wallace's rights.

234.      As a direct and proximate result of the aforesaid conduct, actions and inactions of Defendants and that stated elsewhere herein, Plaintiff was caused to suffer and continues to suffer temporary and permanent physical injuries, physical pain and suffering, mental pain and suffering, including but not limited to, undue emotional distress, mental anguish, humiliation, embarrassment, loss of respect, shame, loss of enjoyment of life and disability, an inability to perform and enjoy his normal and usual activities, and economic damages including, but not limited to, past and future medical bills and expenses, past and future lost time and wages from work, past and future lost earning capacity and unnecessary attorneys' fees, all to the great detriment of Plaintiff.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00, plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial.

**COUNT IV**
**CIVIL RIGHTS ACT [42 U.S.C. § 1985]**
**Conspiracy to Interfere With Civil Rights**

235.     The Plaintiffs adopt and incorporate by reference the allegations contained elsewhere herein with the same effect as if herein fully set forth.

236.    Defendant Officers' actions against Mr. Wallace were based upon his refusal to join the BGF Gang.

237.    Members of the BGF Gang were not subjected to the treatment and unconstitutional conduct that Mr. Wallace suffered from, at the hands of the Defendants.

238.    Two or more Defendant Officers conspired to commit the acts against Mr. Wallace, directly causing his serious injury.

239.    As a direct and proximate result of the aforesaid conduct, actions and inactions of Defendants and that stated elsewhere herein, Plaintiff was caused to suffer and continues to suffer temporary and permanent physical injuries, physical pain and suffering, mental pain and suffering, including but not limited to, undue emotional distress, mental anguish, humiliation, embarrassment, loss of respect, shame, loss of enjoyment of life and disability, an inability to perform and enjoy his normal and usual activities, and economic damages including, but not limited to, past and future medical bills and expenses, past and future lost time and wages from work, past and future lost earning capacity and unnecessary attorneys' fees, all to the great detriment of Plaintiff.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00, plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial.

## COUNT V
## CIVIL RIGHTS ACT [42 U.S.C. § 1986]
### Conspiracy to Interfere With Civil Rights

240.    The Plaintiffs adopt and incorporate by reference the allegations contained elsewhere herein with the same effect as if herein fully set forth.

241.    Defendant Officers knew of the conspiracy to cause the violent injuries to Mr. Wallace, and failed to prevent the wrongful conspiracy.

242.    As a direct and proximate result of the aforesaid conduct, actions and inactions of Defendants and that stated elsewhere herein, Plaintiff was caused to suffer and continues to suffer temporary and permanent physical injuries, physical pain and suffering, mental pain and suffering, including but not limited to, undue emotional distress, mental anguish, humiliation, embarrassment, loss of respect, shame, loss of enjoyment of life and disability, an inability to perform and enjoy his normal and usual activities, and economic damages including, but not limited to, past and future medical bills and expenses, past and future lost time and wages from work, past and future lost earning capacity and unnecessary attorneys' fees, all to the great detriment of Plaintiff.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00, plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial.

## COUNT VI
## CIVIL RIGHTS ACT [42 U.S.C. § 1983]
### First Amendment Retaliation

243.    The Plaintiffs adopt and incorporate by reference the allegations contained elsewhere herein with the same effect as if herein fully set forth.

244.     Defendant Officers retaliated against Mr. Wallace for reporting the unconstitutional behavior that he was subjected to.

245.     Mr. Wallace's reporting of his injuries was protected conduct.

246.     Defendant Officers' actions in facilitating the attacks on Mr. Wallace permanently chilled his ability to exercise his First Amendment rights.

247.     Defendant Officers' conduct did not reasonably advance a legitimate correctional goal.

248.     Defendant Officers acted purely out of personal motive, with malice and gross negligence, and their actions were the direct and proximate cause of Mr. Wallace's injuries.

249.     As a direct and proximate result of the aforesaid conduct, actions and inactions of Defendants and that stated elsewhere herein, Plaintiff was caused to suffer and continues to suffer temporary and permanent physical injuries, physical pain and suffering, mental pain and suffering, including but not limited to, undue emotional distress, mental anguish, humiliation, embarrassment, loss of respect, shame, loss of enjoyment of life and disability, an inability to perform and enjoy his normal and usual activities, and economic damages including, but not limited to, past and future medical bills and expenses, past and future lost time and wages from work, past and future lost earning capacity and unnecessary attorneys' fees, all to the great detriment of Plaintiff.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00, plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial.

40

## COUNT VII
## Articles 24 and 26 of the Maryland Declaration of Rights

250. The Plaintiff adopts and incorporates by reference the allegations contained elsewhere herein with the same effect as if herein fully set forth.

251. Defendants engaged in an activity that violated Plaintiff's rights as protected under the Maryland Declaration of Rights, violating Mr. Wallace's Due process rights.

252. By the actions detailed herein, including, but not limited to: facilitating the attacks on Mr. Wallace, encouraging and failing to prevent the brutal attacks against Plaintiff, the covering up of the attacks against Plaintiff after their occurrence, and the failure to render aid to Plaintiff despite the means and duty to do so, Defendants deprived Plaintiff of his Constitutional rights under the Fourteenth Amendment, including, but not limited to:

    a.   freedom from imprisonment and seizure of freehold, liberty and privilege without due process, and without judgment of his peers;

    b.   freedom from the deprivation of liberty without due process of the law, and without the judgment of his peers;

    c.   freedom from the abuse of power by law enforcement and correctional officers; and

    d.   freedom from summary punishment.

253. Specifically, Defendant Officers' actions were not for penological purposes and were committed with malice and gross negligence, with the intent to cause serious bodily injury to Mr. Wallace.

254.    Defendants acted with deliberate indifference to Mr. Wallace's established rights.

255.    As a direct and proximate result of the aforesaid conduct, actions and inactions of Defendants and that stated elsewhere herein, Plaintiff was caused to suffer and continues to suffer temporary and permanent physical injuries, physical pain and suffering, mental pain and suffering, including but not limited to, undue emotional distress, mental anguish, humiliation, embarrassment, loss of respect, shame, loss of enjoyment of life and disability, an inability to perform and enjoy his normal and usual activities, and economic damages including, but not limited to, past and future medical bills and expenses, past and future lost time and wages from work, past and future lost earning capacity and unnecessary attorneys' fees, all to the great detriment of Plaintiff.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00, plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial.

### COUNT VIII
### Articles 16 and 25 of the Maryland Declaration of Rights

256.    The Plaintiff adopts and incorporates by reference the allegations contained elsewhere herein with the same effect as if herein fully set forth.

257.    Defendants engaged in an activity that violated Plaintiff's rights as protected under the Maryland Declaration of Rights, subjecting Mr. Wallace to cruel and unusual punishment.

258.     By assisting in and furthering the violent attacks on Mr. Wallace, Defendant Officers showed a deliberate indifference to Mr. Wallace's right against cruel and unusual punishment.

259.     As a direct and proximate result of the aforesaid conduct, actions and inactions of Defendants and that stated elsewhere herein, Plaintiff was caused to suffer and continues to suffer temporary and permanent physical injuries, physical pain and suffering, mental pain and suffering, including but not limited to, undue emotional distress, mental anguish, humiliation, embarrassment, loss of respect, shame, loss of enjoyment of life and disability, an inability to perform and enjoy his normal and usual activities, and economic damages including, but not limited to, past and future medical bills and expenses, past and future lost time and wages from work, past and future lost earning capacity and unnecessary attorneys' fees, all to the great detriment of Plaintiff.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00, plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial.

## COUNT IX
### Article 40 of the Maryland Declaration of Rights

260.     The Plaintiff adopts and incorporates by reference the allegations contained elsewhere herein with the same effect as if herein fully set forth.

261.     By retaliating against Mr. Wallace for reporting his injuries to medical staff, his attorney, and on the record in open court, the Defendant Officers maliciously violated Mr. Wallace's right to free speech under the Maryland Declaration of rights.

262.     As a direct and proximate result of Defendants' actions to suppress Mr. Wallace's right to freedom of speech, and as a result of the actions and inactions of Defendants as stated elsewhere herein, Plaintiff was caused to suffer and continues to suffer temporary and permanent physical injuries, physical pain and suffering, mental pain and suffering, including but not limited to, undue emotional distress, mental anguish, humiliation, embarrassment, loss of respect, shame, loss of enjoyment of life and disability, an inability to perform and enjoy his normal and usual activities, and economic damages including, but not limited to, past and future medical bills and expenses, past and future lost time and wages from work, past and future lost earning capacity and unnecessary attorneys' fees, all to the great detriment of Plaintiff.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00, plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial.

## COUNT X
**Negligence**

263.     Plaintiff adopts and incorporates by reference each and every allegation contained elsewhere herein verbatim with the same effect as if herein fully set forth.

264.     Defendants had a duty to provide care, safekeeping, and protection, and, *inter alia*, not create or maintain a dangerous condition which could harm persons such as Plaintiff, who were under their control.

265.     Defendants had a special duty to Plaintiff because of the custodial relationship between Defendants and Plaintiff, and because Defendants put Plaintiff in harm's way by placing him in a zone of danger.

266.     Defendants breached their duty of reasonable care under the circumstances by creating a dangerous condition in the form of encouraging and allowing the brutal attack by other inmates to occur against Plaintiff.

267.     Defendants breached their duty of reasonable care by intentionally failing to timely render appropriate medical aid to Plaintiff, despite the means and duty to do so.

268.     Defendants breached their duty of reasonable care when they actually and proximately caused Plaintiff to suffer physical and mental injuries.

269.     As a direct and proximate result of the aforesaid conduct, actions and inactions of Defendants and as stated elsewhere herein, Plaintiff was caused to suffer and continues to suffer temporary and permanent physical injuries, physical pain and suffering, mental pain and suffering, including but not limited to, undue emotional distress, mental anguish, humiliation, embarrassment, loss of respect, shame, loss of enjoyment of life and disability, an inability to perform and enjoy his normal and usual activities, and economic damages including, but not limited to, past and future medical bills and expenses, past and future lost time and wages from work, past and future lost earning capacity and unnecessary attorneys' fees, all to the great detriment of Plaintiff.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00, plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial.

## COUNT XI
**Gross Negligence**

270.     Plaintiff adopts and incorporates by reference each and every allegation contained elsewhere herein verbatim with the same effect as if herein fully set forth.

271.     Defendant officers acted recklessly with gross negligence and/or malice when the Plaintiff, under their watch and care, was severely injured by other inmates in attacks allowed, facilitated, and assisted in by the Defendant Officers, thereby suffering from severe injuries, including but not limited to a traumatic brain injury.

272.     Defendant Officers knew or should have known that Plaintiff was assaulted by other inmates. Instead of surveilling the unit in which the attack took place, Defendants intentionally failed to provide supervision and immediately secure the cell and render medical assistance, Defendant Officers did nothing and Plaintiff was only rendered care after he was found lying face down, unconscious, in his cell by his cellmate.

273.     Defendant Officers should have rendered timely medical assistance to Plaintiff upon the initiation of the attack.

274.     Because Plaintiff suffered traumatic brain injury, time was of the essence.  Plaintiff was in dire need of medical assistance.

275.     Defendant Officers acted with gross negligence and/or malice by intentionally and knowingly failing to render timely medical assistance to Plaintiff.

276.     Defendant Officers acted with gross negligence and malice when they intentionally transported Mr. Wallace from the "J" Unit to the "G" Section to allow the gruesome attack to take place.

277.     Defendant Officers acted with gross negligence and malice when they intentionally failed to provide Mr. Wallace safety and security from the attacks of other inmates by facilitating the attacks.

278.     By knowingly allowing the assaults against Plaintiff, by failing to render timely medical aid to Plaintiff, and by assisting in the subsequent cover-up by not properly performing surveillance rounds, Defendant officers were acting with wanton and willful disregard of Plaintiff's rights as if such rights did not exist.

279.     In the alternative, Defendant officers acted with malice when they purposefully allowed inmates' assault of Plaintiff to occur.

280.     Defendant officers demonstrated ill-will and an evil and wrongful motive against Plaintiff when they allowed the brutal attack of Plaintiff to occur.

281.     By allowing the attack against Plaintiff, Defendant officers demonstrated a purpose to deliberately and willfully injure Plaintiff.

282.     As a direct and proximate result of the aforesaid conduct, actions and inactions of Defendants and as stated elsewhere herein, Plaintiff was caused to suffer and continues to suffer temporary and permanent physical injuries, physical pain and suffering, mental pain and suffering, including but not limited to, undue emotional distress, mental anguish, humiliation, embarrassment, loss of respect, shame, loss of

enjoyment of life and disability, an inability to perform and enjoy his normal and usual activities, and economic damages including, but not limited to, past and future medical bills and expenses, past and future lost time and wages from work, past and future lost earning capacity and unnecessary attorneys' fees, all to the great detriment of Plaintiff.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00, plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial.

## COUNT XII
### Civil Conspiracy

283.    Plaintiff adopts and incorporates by reference each and every allegation contained elsewhere herein verbatim with the same effect as if herein fully set forth.

284.    Defendants, or their agents or employees, by agreement and understanding, agreed to and did jointly commit the unconstitutional, unlawful and tortious conduct described herein by unlawful and tortious means, including but not limited to: facilitating violent physical attacks on Mr. Wallace, retaliating against him for not joining the BGF Gang, retaliating against him for reporting the injuries that he sustained, and committing such actions without furthering a legitimate correctional goal.

285.    Each Defendant, or their agents or employees, took at least one unlawful action in knowing furtherance of the conspiracy.

286.    Plaintiff suffered, and continues to suffer, actual legal damage as a direct and proximate result of Defendants' actions.

287.    As a direct and proximate result of the aforesaid conduct, actions and inactions of Defendants, as well as those stated elsewhere herein, Plaintiff was caused to suffer and continues to suffer the mental, emotional, and economic damages described above.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00, plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial.

## COUNT XIII
### Intentional Infliction of Emotional Distress

288.    At all relevant times herein, Plaintiff was under the care, custody, and control of Defendants, its agents, servants, and employees, including Defendant Officers.

289.    Defendants intentionally inflicted emotional distress on Plaintiff by subjecting him to repeat attacks at the hands of other inmates, ensuring that the attacks were carried out and participating in covering up the attacks.

290.    Through the intentional acts detailed elsewhere herein, the Defendants directly and proximately caused injury to the Plaintiffs.

291.    Defendants engaged in conduct that was intentional and reckless, and in a high degree of probability that emotional distress would result to Plaintiffs.

292.    Defendants knew, or should have known that facilitating the violent attacks on Mr. Wallace would result in extreme emotional distress.

293.    The Defendants' conduct was beyond all possible bounds of decency and intolerable.

294.    The conduct of Defendants was willful and intentional.

295.    As a direct and proximate result of the aforesaid conduct, actions and inactions of Defendants and as stated elsewhere herein, Plaintiffs have sustained, and will continue to sustain, actual emotional injuries, including but not limited to severe emotional and mental distress, and economic damages, including but not limited to, past and future medical bills and expenses.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00, plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial.

### COUNT XIV
**Assault**

296.    Plaintiff adopts and incorporates by reference each and every allegation contained elsewhere herein verbatim with the same effect as if herein fully set forth.

297.    At all times relevant to this action, Defendant Officers and Defendant Administrators acted in concert and joint action with one another.

298.    Defendants, in words and actions, acted with intent and capability to do bodily harm to Mr. Wallace.

299.    Defendants intended to cause, and did cause, Mr. Wallace to suffer apprehension of immediate battery.

300.    Defendants' conduct was perpetrated with actual malice.

301.    Defendant Officers were acting on orders, directly or indirectly, from Defendant Administrators.

302.     As a direct and proximate result of the aforesaid conduct, actions and inactions of Defendants and as stated elsewhere herein, Plaintiff was caused to suffer and continues to suffer temporary and permanent physical injuries, physical pain and suffering, mental pain and suffering, including but not limited to, undue emotional distress, mental anguish, humiliation, embarrassment, loss of respect, shame, loss of enjoyment of life and disability, an inability to perform and enjoy his normal and usual activities, and economic damages including, but not limited to, past and future medical bills and expenses, past and future lost time and wages from work, past and future lost earning capacity and unnecessary attorneys' fees, all to the great detriment of Plaintiff.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00, plus interest, costs and attorneys' fees, and punitive damages, in an amount to be determined at trial.

## JURY DEMAND

Plaintiff demands a jury trial as to all claims so triable.

Respectfully submitted,

HANSEL LAW, PC

_____/s/_____
Cary J. Hansel (Bar No. 14722)
Erienne A. Sutherell (Bar No. 20095)
2514 N. Charles Street
Baltimore, Maryland 212118
301/461-1040 (telephone)
443/451-8606 (Facsimile)
cary@hansellaw.com
esutherell@hansellaw.com
*Counsel for Plaintiffs*