**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

NICOLE WALLACE, *et al.*,                             *
                                                       *
v.                                                     *               Civil No. CCB-17-3718
                                                       *
STEPHEN T. MOYER, *et al.*                             *
                                                       *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM

Plaintiffs Nicole Wallace and Daquan Wallace filed a fourteen-count complaint against

defendants Stephen T. Moyer, Betty Johnson, Tamara Patterson, Jackens Rene, Ericka N. Shird,

and Lisa Portee, alleging violations of the U.S. and Maryland constitutions as well as various tort

claims. (2d Am. Compl., ECF 82). Moyer is the former Secretary of Maryland's Department of

Public Safety and Correctional Services ("DPSCS"), Johnson is the former warden of the

Baltimore City Detention Center ("BCDC"), and Patterson, Rene, Shird, and Portee are former

BCDC correctional officers. The defendants filed a motion to dismiss or, in the alternative, for

summary judgment. (Mot., ECF 85). The motion has been fully briefed and no oral argument is

necessary. For the reasons explained below, the motion will be granted in part and denied in part.

## BACKGROUND[1]

The following facts are taken from the Second Amended Complaint. On September 3,

2014, Daquan Wallace was committed to BCDC pending trial on nonviolent criminal charges.

(2d Am. Compl. ¶ 164). His bail was set at $75,000, which he could not afford to pay. (*Id.* ¶¶ 2,

42). Within one week of his commitment, Mr. Wallace complained to BCDC officials and the

offices of Johnson and Moyer that he was being targeted for rape and fights due to his refusal to

join the Black Guerilla Family ("BGF") gang. (*Id.* ¶ 25). An infirmary report dated six days after

---

[1] The parties have a lengthy history. The court recites the minimum facts necessary to resolve the motion.

Mr. Wallace was committed notes that he reported "fight/rape" and was provided with HIV education. (*Id*. ¶ 26).

Mr. Wallace informed his mother, Nicole Wallace, that he had been the victim of frequent, violent attacks by gang members and that he feared for his life. (2d Am. Compl. ¶¶ 27, 29). During a visit to BCDC in October 2014, Ms. Wallace observed bruising on Mr. Wallace's face, but Mr. Wallace refused to discuss it with her due to fears for his safety. (*Id*. ¶ 36). Ms. Wallace began calling BCDC to advise officials of the threats to her son. (*Id*. ¶ 30). Ms. Wallace spoke with BCDC staff on at least six occasions, informing them that Mr. Wallace was in danger due to his refusal to join BGF and asking them to take measures to protect Mr. Wallace. (*Id*. ¶ 32). On or about November 5, 2014, Ms. Wallace spoke with correctional officer Patterson, told Patterson about the death threats against Mr. Wallace, and asked that Mr. Wallace be moved to protective custody. (*Id*. ¶¶ 35, 15). On or about November 8, 2014, Ms. Wallace spoke with Warden Johnson, told Johnson about the death threats against Mr. Wallace, and asked that Mr. Wallace be moved to protective custody. (*Id*. ¶ 35). On or about November 19, 2014, Ms. Wallace again spoke with Patterson; Patterson acknowledged injury to Mr. Wallace's eye, stated she was concerned for his safety, and indicated that he would be moved to protective custody. (*Id*.). Mr. Wallace, however, was never moved to protective custody. (*Id*. ¶ 37).

On December 2, 2014, Mr. Wallace was again attacked by other BCDC inmates. (2d Am. Compl. ¶¶ 38–39). He sustained bruising to his face and left eye, a laceration to his lower lip, and a left shoulder abrasion. (*Id*. ¶ 38). Later that day, Mr. Wallace was transported to the Baltimore City Courthouse for a pretrial conference. (*Id*. ¶ 40). During transport, Mr. Wallace was again attacked by other inmates. (*Id*. ¶ 41). At the hearing, Mr. Wallace was bleeding from one eye and his other eye was swollen shut. (*Id*. ¶ 44). Mr. Wallace's attorney argued for bail

reduction so that Ms. Wallace could post bail and protect her son from further harm. (*Id.* ¶ 42). The presiding judge declined to review bail. (*Id.* ¶ 45).

At approximately 6 p.m. on December 2, 2014, Mr. Wallace reported to several correctional officers that he had been hit in the eye, was having trouble seeing, and needed medical treatment. (2d Am. Compl. ¶ 46). Later that night, Ms. Wallace again contacted BCDC officials to express concern about her son's welfare, noting her belief that Mr. Wallace was being subjected to assaults while in the presence of BCDC staff. (*Id.* ¶ 47). For the next two weeks, Ms. Wallace spoke with her son several times; each time they spoke, Mr. Wallace indicated that there were too many people present for him to discuss his safety. (*Id.* ¶ 49).

Throughout most of his detention at BCDC, Mr. Wallace was assigned to the Jail Industries ("JI") building. (2d Am. Compl. ¶ 50). JI tended to hold nonviolent offenders and inmates with lower security classifications, as compared with the more dangerous Men's Detention Center ("MDC"). (*Id.* ¶¶ 52, 69). The JI building had open dormitory housing, and each dormitory was supervised by two officers. (*Id.* ¶¶ 66, 67). MDC, by contrast, contained "more private cells," and each tier was supervised by one officer. (*Id.* ¶ 68).

On the morning of December 18, 2014, correctional officer Rene worked the "A Shift" at JI and interacted with Mr. Wallace. (2d Am. Compl. ¶ 53). During A Shift, Patterson falsely claimed that a correctional officer working in the JI building had complained about Mr. Wallace being disrespectful and insubordinate and that, as a result, Mr. Wallace should be transferred. (*Id.* ¶¶ 54–55). Patterson directed correctional officer Portee to complete paperwork to have Mr. Wallace transferred, citing false allegations that Mr. Wallace was extorting other inmates. (*Id.* ¶¶ 57–59, 61).

After working the A Shift in the JI building, Rene was scheduled to work the B Shift in

the G-Section of MDC. (2d Am. Compl. ¶ 72). Correctional officer Shird had worked the A Shift in G-Section on December 18, 2014, but on that day also worked overtime hours and overlapped with Rene on B Shift. (*Id*. ¶ 73). During B Shift, Rene accepted the transfer of Mr. Wallace from the J-Section of the JI building to the G-Section of MDC, despite the fact that the transfer paperwork did not contain the shift commander's approval or a traffic officer's signature, which are required for a valid transfer. (*Id*. ¶¶ 51, 74–78, 80). Rene signed off on the deficient transfer form and placed Mr. Wallace in his cell with his handcuffs still on. (*Id*. ¶ 85). Immediately thereafter, Mr. Wallace's new cellmate was ordered out of the cell by Rene and told to leave early for dinner. (*Id*. ¶ 86). Five to ten minutes later, the rest of G-Section was released for dinner, but Rene did not allow Mr. Wallace to go. (*Id*. ¶¶ 86–87). Instead, Rene held Mr. Wallace back with the inmates in cells 3, 47, and 48, who were BGF members. (*Id*. ¶¶ 87, 121). It was against BCDC policy to allow inmates to stay back from dinner unless medically authorized, which none of these inmates were. (*Id*. ¶ 90, 91).

While the rest of G-Section tier was at dinner, Rene released the inmates from cells 3, 47, and 48. (2d Am. Compl. ¶ 92). Rene either personally opened Mr. Wallace's cell or gave the keys to Shird to open. (Id. ¶¶ 92, 93). The inmates from cells 3, 47, and 48 then entered Mr. Wallace's cell, beat him severely, and attempted to rape him. (*Id*. ¶ 97). Rene and Shird were present on the tier and witnessed the attack. (*Id*. ¶¶ 97–98, 102, 118).

Rene later submitted a false report that Mr. Wallace went to dinner that evening. (2d Am. Compl. ¶¶ 99, 122–24, 126). Rene also reported that while the other G-Section inmates were at dinner, he twice completed "rounds," which involved walking from cell to cell and making sure that all the cells were secure. (*Id*. ¶ 100). Within minutes of when Rene claims to have completed a round, marking Mr. Wallace's cell as vacant and secured, the other G-Section inmates returned

from dinner. (*Id.* ¶ 103). Rene locked the inmates of cells 3, 47, and 48 back in their cells. (*Id.* ¶ 108). Upon returning from dinner, Mr. Wallace's cellmate found Mr. Wallace unresponsive in his bunk and immediately notified Rene. (*Id.* ¶ 106). Rene did not timely call for medical assistance. (*Id.* ¶ 127). Eventually, the BCDC Medical Unit responded to treat Mr. Wallace for multiple head wounds. (*Id.* ¶ 109). Due to the severity of Mr. Wallace's injuries, EMS personnel were called to the scene, and Mr. Wallace was taken to the hospital. (*Id.* ¶ 141–42).

As a result of the attack, Mr. Wallace sustained a traumatic brain injury and a fracture to his inner eye socket, along with various other injuries. (2d Am. Compl. ¶ 143). He remained in a comatose vegetative state for nearly one month after the attack. (*Id.* ¶ 144). While in treatment, Mr. Wallace experienced bed sores, pneumonia, a tracheostomy tube for ventilation, and a feeding tube. (*Id.* ¶ 160). As of the filing of the Complaint, Wallace's feeding and tracheostomy tubes had been removed, but he was unable to talk, walk, or write; remained on a ventilator; was confined to a chair; required 24-hour care; and underwent intensive daily therapy. (Id. ¶¶ 145, 160).

Several months later, on April 25, 2015, then-BCDC warden Johnson was approached by a former BCDC inmate. (2d Am. Compl. ¶ 130). The inmate refused to give his name but was later identified as Lloyd Noonan. (*Id.* ¶¶ 130, 136). Noonan asked Johnson "if they ever found out who killed the young boy on G-Section[]in December," and indicated he was there when it happened. (*Id.* ¶ 130). Noonan said that BGF members "Flatline, Meatball, and D-Nice beat him up and put him back in his bed" and that "Ofc. Sheraton was on the section and allowed these assaults and robberies to occur." (*Id.*).

\*　　\*　　\*

The Wallaces' Second Amended Complaint asserts fourteen counts against the

defendants: violations of Fourteenth Amendment due process (Count I); violations of various rights under the Fourth and Fourteenth Amendments (Count II); deliberate indifference to harm in violation of the Eighth Amendment (Count III); conspiracy to interfere with civil rights in violation of 42 U.S.C. § 1985 and § 1986 (Counts IV and V); retaliation in violation of the First Amendment (Count VI); violations of due process under Articles 24 and 26 of the Maryland Declaration of Rights (Count VII); deliberate indifference to harm in violation of Articles 16 and 25 of the Maryland Declaration of Rights (Count VIII); retaliation in violation of Article 40 of the Maryland Declaration of Rights (Count IX); negligence (Count X); gross negligence (Count XI); common law civil conspiracy (Count XII); intentional infliction of emotional distress (Count XIII); and assault (Count XIV).

The Wallaces appear to assert Counts I, II, III, VII, VIII, X, XII, XIII and XIV against all defendants, but assert Counts IV, V, VI, IX, and XI against only Patterson, Rene, Shird, and Portee (the "officer defendants").[2]

### STANDARD OF REVIEW

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted). "Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is

---

[2]     Throughout the Second Amended Complaint, the Wallaces refer to Moyer and Johnson as the "Defendant Administrators."

'probable,' the complaint must advance the plaintiff's claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). Additionally, although courts "must view the facts alleged in the light most favorable to the plaintiff," they "will not accept 'legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments'" in deciding whether a case should survive a motion to dismiss. *U.S. ex rel. Nathan v. Takeda Pharm. North Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013) (quoting *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012)).

## ANALYSIS

### I. Conversion of the motion to dismiss to one for summary judgment

The defendants argue that they are entitled to summary judgment on certain claims against them. The Wallaces counter that summary judgment is premature. The Wallaces acknowledge that discovery has been conducted in a parallel state court action,[3] but note that the state court case involves "different parties, different claims, and different damages." (Opp'n at 27, ECF 89). The Wallaces assert that additional discovery in *this* matter is "absolutely necessary." (*Id.*). As conversion of a motion to dismiss to one for summary judgment "is not appropriate when the parties have not had an opportunity to conduct reasonable discovery," *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015), the court will not review the Wallaces' claims under the summary judgment standard at this time.

The court notes that the defendants attach to their motion depositions taken as part of the state court case. The defendants rely heavily on these depositions in their arguments. Although the court will review the Wallaces' claims under the motion to dismiss standard, the court is not precluded from considering the depositions. "Consideration of a document attached to a motion

---

[3]     The parallel state court action is Baltimore City Circuit Court Case No. 24-C-17-006410.

to dismiss [] is permitted [] when the document is integral to and explicitly relied on in the complaint, and when the plaintiffs do not challenge the document's authenticity." *See Zak,* 780 F.3d at 606–07 (citation, quotation marks, and brackets omitted). Here, the depositions of Rene, Portee, Patterson, Shird, and Johnson are integral to and explicitly relied on in the Second Amended Complaint. Throughout the complaint, the Wallaces describe things that the defendants have "admitted," "claimed," or "testified" to. (*See, e.g.*, 2d Am. Compl. ¶¶ 54, 59, 63, 79, 84). These appear to be references to the state court depositions. Indeed, the Wallaces acknowledge that they relied upon the state court depositions to support the claims in the Second Amended Complaint, (Opp'n at 27), and attach to their Opposition the same depositions attached to the defendants' motion. Accordingly, the court will consider the state court depositions of Rene, Portee, Patterson, Shird, and Johnson in ruling on the motion to dismiss. Any additional evidence extrinsic to the Second Amended Complaint will not be considered.

## II.    Claims against Moyer

The Wallaces bring claims against Moyer only in his official capacity. Indeed, the parties agree that Moyer was not DPSCS Secretary on December 18, 2014, nor is he the current DPSCS Secretary.[4] Moreover, the Wallaces have indicated that the claims against Moyer are brought pursuant to Federal Rule of Civil Procedure 25(d), (*see* Opp'n at 51 n.6), which applies only to official capacity suits, *see* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer *who is a party in an official capacity* . . . ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party.") (emphasis added). Official capacity suits "generally represent only another way of pleading an action against an entity of which an

---

[4]    According to the DPSCS website, Robert L. Green has occupied the office of Secretary since May 13, 2019. *See* DPSCS Home Page, https://msa.maryland.gov/msa/mdmanual/22dpscs/html/msa18110.html (last visited March 25, 2020).

officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (citation omitted). As "a suit against a state official in his or her official capacity . . . is no different from a suit against the State itself," *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (citing *Graham*, 473 U.S. at 165–66), the court will construe the claims against Moyer (Counts I–III, VII–VIII, X, XII–XIV) as claims against the state of Maryland and, as explained below, will dismiss the claims.

The Wallaces' federal constitutional claims against Moyer are brought pursuant to 42 U.S.C. § 1983, which provides that any "person" who, "under color" of state law, violates another's constitutional rights, "shall be liable to the party injured." *See* 42 U.S.C. § 1983. The Supreme Court has held, however, that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *See Will*, 491 U.S. at 71. The federal constitutional claims (Counts I–III) thus will be dismissed.

The Wallaces' state law claims against Moyer must also be dismissed. While the Maryland Tort Claims Act ("MTCA") provides a limited waiver of Maryland's sovereign immunity for tort claims (including constitutional torts), *see* Md. Code Ann., State Gov't § 12-104; *Lee v. Cline*, 384 Md. 245, 255 (2004), that waiver does not apply to claims based on tortious acts or omissions of state personnel "made with malice or gross negligence," *see* Md. Code Ann., Cts. & Jud. Proc. § 5-522(a)(4)(ii). As the claims against Moyer are essentially claims against Maryland premised on the actions of the other defendants, these claims are only cognizable if the alleged actions were made *without* malice or gross negligence. In the Second Amended Complaint, however, the Wallaces explicitly allege that the defendants acted *with* malice or gross negligence. *See* Part IX.A, *infra*. Accordingly, Moyer is immune from suit on the state law claims, and Counts VII–VIII, X, and XII–XIV will be dismissed as to Moyer.

**III.     Failure to protect claims (Counts I and VII)**

While Counts I and VII appear to contain vague and expansive allegations of federal and state constitutional violations, (*see* 2d Am. Compl. ¶¶ 196, 252), the defendants more simply characterize these counts as a Fourteenth Amendment failure to protect claim (Count I) and a failure to protect claim brought under Articles 24 and 26 of the Maryland Declaration of Rights (Count VII), (Mot. at 5–6). This characterization makes sense. The Supreme Court has held that "when an aspect of pretrial detention that is not alleged to violate any express guarantee of the Constitution is challenged," the only cognizable Fourteenth Amendment due process claim is a challenge to "conditions or restrictions of pretrial detention that . . . amount to punishment of the detainee." *See Bell v. Wolfish,* 441 U.S. 520, 534–36 (1979) ("[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law.").[5] A government official's deliberate indifference to a pretrial detainee's serious medical needs amounts to unconstitutional "punishment," *Belcher v. Oliver*, 898 F.2d 32, 34 (4th Cir. 1990), as does "a prison official's deliberate indifference to a substantial risk of serious harm," (i.e., failure to protect), *see Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001) (internal quotation marks omitted).[6] Here, the Wallaces allege that the defendants knew about serious risks to Mr. Wallace's safety and, at minimum, failed to protect him from those risks. The court thus agrees with the defendants' characterization of Counts I and VII as "failure to protect" claims. In any event, the Wallaces do not appear to contest this characterization. (*See* Opp'n at

---

[5]     While the *Wolfish* Court observed that a pretrial detainee's due process challenge might also involve "his understandable desire to be as comfortable as possible during his confinement," *Wolfish*, 441 U.S. at 534, the Court held that such a desire "simply does not rise to the level of those fundamental liberty interests" protected by substantive due process. *Id*.

[6]     In *Brown*, the Fourth Circuit applied the Supreme Court's analysis in *Farmer v. Brennan*, 511 U.S. 825 (1994), an Eighth Amendment failure to protect case, to a pretrial detainee's Fourteenth Amendment failure to protect claim. *See* 240 F.3d at 388–90. In so doing, the Fourth Circuit noted that the "deliberate indifference" standard under either the Eighth or Fourteenth Amendments is the same. *Id*. at 388.

38–42).[7]

A pretrial detainee's Fourteenth Amendment failure to protect claim is analyzed under the two-pronged inquiry set forth in *Farmer v. Brennan*, 511 U.S. 825 (1994). *See Brown*, 240 F.3d at 388–90 (applying *Farmer* to a pretrial detainee's failure to protect claim); *King-Fields v. Leggett*, No. CIV.A. ELH-11-1491, 2014 WL 694969, at *10 (D. Md. Feb. 19, 2014) (same).[8] First, a pretrial detainee must show that he is being detained under conditions posing a "substantial risk" of "objectively, sufficiently serious" harm. *Brown*, 240 F.3d at 389 (citations omitted). Second, the detainee must show that the government official acted with "deliberate indifference." *Id.* (citations omitted). "Deliberate indifference" is a subjective standard; it requires that the official knew of the general risk and acted unreasonably in response to it. *Id.* (citations omitted).[9]

---

[7]     Based on the language of the Second Amended Complaint alone, it is difficult for the court to comprehend the exact scope of the claims alleged in Counts I and VII. Count I, for example, contains the following "claim":

    Defendants deprived Plaintiff of his Constitutional rights under the Fourteenth Amendment, including but not limited to:

    a.  freedom from imprisonment and seizure of freehold, liberty and privilege without due process, and without judgment of his peers;

    b.  freedom from the deprivation of liberty without due process of the law, and without the judgment of his peers;

    c.  freedom from the abuse of power by law enforcement and correctional officers;

    d.  freedom from summary punishment; and

    e.  freedom from prison officials' and employees' deliberate indifference to the health and safety of inmates and deliberate indifference to serious assaults by other inmates.

(2d Am. Compl. ¶ 196). The Wallaces further allege in Count I that the defendants' actions infringed on, *inter alia*, Mr. Wallace's "protected property and liberty interest in his freedom, his ability to exercise his free will and domain over his person, his ability to be free from unlawful and unwelcome abuse and attack by prison employees and administrators, and his ability to practice his chosen profession and earn a living thereby." (*Id.* ¶ 198). Count VII contains similar language; the only clear difference between the Counts is the constitutional provision under which each is brought.

    While the court here is able to rely on later representations by plaintiffs' counsel to decipher the meaning of these Counts, the court firmly discourages this type of pleading in the future.

[8]     Unpublished opinions are cited for the soundness of their reasoning, not any precedential value.

[9]     The Wallaces argue that the Supreme Court dispensed with the subjective component of the failure to protect inquiry in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015). (Opp'n at 39–40). The court is not persuaded. At issue in *Kingsley* was the appropriate standard for a pretrial detainee's excessive force claim, not a failure to protect claim. *See id.* at 2473. Moreover, at least one court in this district has declined to extend the holding of *Kingsley* to claims of deliberate indifference to a serious medical need, noting that "neither this Court nor the Fourth Circuit has applied *Kingsley* to a pretrial detainee's claim of failure to protect or deliberate indifference to a serious medical need, where there are no allegations of force applied by the defendants." *See Perry v. Barnes*, No. CV PWG-16-705,

The court will also analyze the Wallaces' state constitutional failure to protect claim (Count VII) using the *Farmer* framework. Article 24 of the Maryland Declaration of Rights provides to pretrial detainees at least as much due process protection as the Fourteenth Amendment, *Smith v. Bortner*, 193 Md. App. 534, 553 (2010) (citing *Koshko v. Haining*, 398 Md. 404, 443–44 (2007)), and "Supreme Court interpretations of the Fourteenth Amendment function as authority for interpretation of Article 24," *Pitsenberger v. Pitsenberger*, 287 Md. 20, 27 (1980) (citations omitted).[10]

The defendants argue that the Wallaces cannot meet the second prong of the *Farmer* inquiry and that, consequently, Counts I and VII must be dismissed. The court will address the claims against each defendant in turn.

A. Rene

The defendants argue that Rene did not act with deliberate indifference because (1) he did not know Mr. Wallace was in danger until the assault on December 18, 2014, (Mot. at 18), and (2) once he *did* suspect Mr. Wallace may be in danger, he acted reasonably to avert the harm, (*id.* at 19). In so arguing, the defendants recite a version of the events on December 18, 2014, that differs substantially from the allegations of the Second Amended Complaint. Relying on Rene's state court deposition, the defendants assert that on December 18, 2014, Mr. Wallace went to dinner with the rest of his tier and was assaulted after he and the other G-Section inmates returned. (Mot. at 17–18). According to the defendants, once Rene realized there was a

_____

2019 WL 1040545, at *3 n.3 (D. Md. Mar. 5, 2019); *accord Mays v. Sprinkle*, No. 7:18CV00102, 2019 WL 3848948, at *1 (W.D. Va. Aug. 15, 2019). The court will thus treat *Kingsley* as limited to its terms and assume that *Farmer* still provides the appropriate framework for analyzing Fourteenth Amendment failure to protect claims.
[10]    While Article 24 may, in some cases, offer *more* protection than the due process clause of the Fourteenth Amendment, *see Koshko*, 398 Md. at 443–44 & n.22, the Wallaces offer no examples where Maryland courts have held that a pretrial detainee's state constitutional rights in this context exceed those guaranteed by the Fourteenth Amendment. Accordingly, the court will assume that a pretrial detainee's rights under Article 24 are coextensive with those under the Fourteenth Amendment.

disturbance near Mr. Wallace's cell, he called for assistance from other officers. (Mot. at 18). Based on this version of events, the defendants argue that the Wallaces fail to state a failure to protect claim against Rene. (*Id*. at 19).

On a motion to dismiss, however, the court assesses the sufficiency of the plaintiffs'—not the defendants'—version of events. The Wallaces allege that Rene (1) accepted a deficient transfer of Mr. Wallace for the purpose of allowing him to be assaulted by BGF members; and (2) facilitated the assault by preventing Mr. Wallace from attending dinner, unlocking the cells of Mr. Wallace and his assailants, and failing to intervene while Mr. Wallace was being assaulted in front of him. Taken as true, these facts certainly support the claim that Rene acted with deliberate indifference to a serious risk to Mr. Wallace. *Cf. Short v. Smoot*, 436 F.3d 422, 427 (4th Cir. 2006) ("[D]eliberate indifference . . . is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." (citation omitted)). Accordingly, the court will not dismiss Counts I and VII against Rene.

B. Shird

The defendants argue that Shird could not have acted with deliberate indifference toward Mr. Wallace because "there is no connection between CO Shird and this incident." (Mot. at 19). The defendants assert that "Shird denied knowing anything about Daquan Wallace, and attested in her deposition that his bed was empty, and that he was not assigned to her section during her shift." (*Id*. at 16). Relying on Rene's state court deposition, the defendants further assert that when Mr. Wallace arrived on G-Section on December 18, 2014, Shird had already left for the day and had no knowledge of the transfer. (*Id*. at 16–17). But as the court explained above, for the purposes of this motion, the court accepts as true the allegations of the Second Amended Complaint. The Wallaces allege that Shird worked overtime hours on December 18, 2014, so

that she would overlap with Rene on B Shift, and—like Rene—failed to intervene when Mr. Wallace was being assaulted in front of her. These allegations are sufficient to state a claim of deliberate indifference, and Counts I and VII against Shird will not be dismissed.[11]

C. Patterson and Portee

The defendants argue that Patterson and Portee did not act with deliberate indifference toward Mr. Wallace because, while they admit they were responsible for Mr. Wallace's transfer, "[t]he reasons for the transfer stemmed solely from the conduct of Daquan Wallace at JI," and the transfer "served to protect Mr. Wallace by placing him in a more secure setting, away from the dormitory at JI where he had been pressured allegedly to join a gang." (Mot. at 15). This version of events is supported by the defendants' state court depositions. The Wallaces, however, allege that Patterson and Portee orchestrated the transfer for the purpose of allowing Mr. Wallace to be assaulted. The Wallaces point to the deficient transfer paperwork; the fact that the justification for the transfer was fabricated; and the fact that even if the stated reason for Mr. Wallace's transfer—his alleged extortion of other detainees for commissary—was true, it would not have been grounds for the transfer. (2d Am. Compl. ¶¶ 57–64). Taken as true, these allegations are sufficient to satisfy the standard for deliberate indifference. Accordingly, Counts I and VII against Patterson and Portee will not be dismissed.

D. Johnson

The defendants argue that Johnson did not act with deliberate indifference toward Mr. Wallace because "[t]here are no facts demonstrating that Warden Johnson turned a blind eye" to

---

[11]     The parties dispute whether Shird is the "Ofc. Sheraton" Noonan referenced in his conversation with Johnson. The Wallaces allege that the "Ofc. Sheraton" alleged to have witnessed the assault was actually Shird. (2d Am. Compl. ¶ 132). The defendants, however, claim that Shird was "sued simply because her last name resembles 'Sheraton,' and because she worked occasionally on G Section." (Mot. at 16). For now, the court will assume that the Wallaces have a good faith basis—beyond the reference to "Ofc. Sheraton" in Johnson's email—to assert these allegations against Shird.

the threats against Mr. Wallace. (Mot. at 8). The court disagrees. Although the Second Amended Complaint contains minimal allegations regarding Johnson's conduct, the Wallaces do allege that on November 8, 2014, Ms. Wallace communicated to Johnson her concerns about Mr. Wallace's safety and requested he be moved to protective custody, but that Johnson failed to do so. (2d Am. Compl. ¶ 35). As explained above, "deliberate indifference" requires that the official knew of a substantial risk of serious harm to the plaintiff and acted unreasonably in response to that harm. *See Brown*, 240 F.3d at 389. The Wallace's contend that Johnson's failure to move Mr. Wallace to protective custody—despite Ms. Wallace's pleas and the fact that Mr. Wallace was the victim of frequent attacks by other inmates—was unreasonable and amounted to deliberate indifference. (Opp'n at 52–53). Based on these allegations, the Wallaces have sufficiently stated a claim of deliberate indifference. Counts I and VII against Johnson will not be dismissed.

## IV.     Fourth Amendment claim (Count II)

In Count II, the Wallaces assert claims against the defendants under the Fourth and Fourteenth Amendments. Although the language of Count II is not entirely clear, it appears that the Fourth Amendment claim is for excessive force. (*See* 2d Am. Compl. ¶ 213). The defendants argue that this claim should be dismissed, as the Fourth Amendment does not apply to actions taken against pretrial detainees.

According to the Wallaces, the Supreme Court case *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), provides that "Fourth Amendment excessive force claims brought by a pretrial detainee are analyzed pursuant to the Fourteenth Amendment due process jurisprudence." (Opp'n at 53). But *Kingsley*, a Fourteenth Amendment case that did not involve Fourth Amendment claims, contains no such holding. *See* 135 S. Ct. at 2470. Indeed, the Fourth Circuit has expressly rejected the idea that the Fourth Amendment governs claims brought by pretrial

detainees, explaining, "[o]nce the single act of detaining an individual has been accomplished, the Amendment ceases to apply." *Robles v. Prince George's Cty., Maryland*, 302 F.3d 262, 268 (4th Cir. 2002). Accordingly, the Fourth Amendment excessive force claim in Count II will be dismissed as to all defendants.

Without the Fourth Amendment claim, it is difficult to see how Count II differs from Count I. Count II is captioned as "CIVIL RIGHTS ACT [42 U.S.C. § 1983] Fourth & Fourteenth Amendment," and includes claims of summary punishment, deliberate indifference, and due process violations. (2d Am. Compl. ¶¶ 213, 217). Count I, though, already captures the Wallaces' Fourteenth Amendment claims. The remaining claims in Count II are thus redundant, and the court will dismiss Count II against all defendants in its entirety. *See* Fed. R. Civ. P. 12(f) ("The court may strike from a pleading . . . any redundant . . . matter.").[12]

## V.      Article 26 excessive force claim

The defendants argue that, to the extent the Wallaces attempt in Count VII to bring an excessive force claim under Article 26 of the Maryland Declaration of Rights, that claim should be dismissed. (Mot. at 22). Although nowhere in Count VII do the words "excessive force" appear, the parties proceed as if the claim exists. The court will thus analyze their arguments in turn.

As explained in Part IV, *supra*, a pretrial detainee may not bring an excessive force claim under the Fourth Amendment. The defendants argue that the Article 26 excessive force claim in Count VII should thus be dismissed, as Article 26 is "Maryland's analogue to the Fourth Amendment," *see Randall v. Peaco*, 175 Md. App. 320, 330 (2007), which Maryland courts "consistently construe[] . . . as being *in pari materia* with the Federal provision," *see Scott v.*

---

[12]      To the extent that the Wallaces also assert in Count II a civil conspiracy claim, (*see* 2d Am. Compl. ¶¶ 215–16), that claim will be dismissed as duplicative of Counts IV and V.

*State*, 366 Md. 121, 139 (2001). The Wallaces counter that whether Article 26 extends to pretrial detainees' excessive force claims is an unsettled question of Maryland law. (Opp'n at 54). Indeed, "[t]here appears to be no Maryland case adopting or rejecting the 'continuing seizure' rationale for an Article 26 or a Fourth Amendment excessive force claim[.]" *Smith v. Bortner*, 193 Md. App. 534, 548 (2010).[13] But the *Bortner* court did not address the question further, and the Wallaces cite no cases where a court applying Maryland law analyzed a pretrial detainee's excessive force claim under Article 26. The court is thus not persuaded that it should depart from Maryland courts' practice of "essentially [] equat[ing]" Article 26 with the Fourth Amendment. *See Scott*, 366 Md. at 139 n.2. Accordingly, to the extent that it exists, the Wallaces' Article 26 excessive force claim in Count VII will be dismissed.[14]

## VI.    Cruel and unusual punishment claims (Counts III and VIII)

The defendants argue that the Wallaces' Eighth Amendment and Articles 16 and 25 claims (Counts III and VIII, respectively) must be dismissed, as these constitutional provisions do not apply to pretrial detainees. The court agrees. The Supreme Court has explained that the Eighth Amendment's prohibition on cruel and unusual punishment applies only to convicted prisoners, and that a pretrial detainee's claims of mistreatment while detained are instead governed by the Fourteenth Amendment's due process clause. *See Kingsley*, 135 S. Ct. at 2475. Maryland courts read Articles 16 and 25 as *in pari materia* with the Eighth Amendment. *See*

---

[13]    The "continuing seizure" doctrine "extend[s] Fourth Amendment protections beyond a suspect's initial arrest to include, to various degrees, some of the time during which the suspect remains in police custody." *Bortner*, 193 Md. App. at 547.

[14]    The Wallaces argue that because this claim involves an unsettled area of Maryland law, the court should allow both claims to proceed, as analysis of a pretrial detainee's excessive force claim under Article 26 uses the same standard as analysis under Article 24. The Wallaces are mistaken. While "Maryland cases have said that the standard for analyzing *claims of excessive force by police officers* are the same under Articles 24 and 26," *Bortner*, 193 Md. App. at 544 (emphasis added), Maryland courts have not yet determined whether a pretrial detainee's excessive force claim is even cognizable under Article 26, let alone under which standard to analyze it, *id*. at 544–45.

*Brooks v. State*, 104 Md. App. 203, 213 n.2 (1995), *abrogated on other grounds by Winters v. State*, 434 Md. 527 (2013), (citing *Harris v. State*, 312 Md. 225, 237 n. 5 (1988)). Accordingly, Counts III and VIII will be dismissed.[15]

## VII. Conspiracy to interfere with civil rights (Counts IV and V)

In Counts IV and V, the Wallaces allege that the officer defendants engaged in a conspiracy to violate Mr. Wallace's civil rights in violation of 42 U.S.C. § 1985 (Count IV) and § 1986 (Count V). Section 1985 prohibits a conspiracy to deprive persons of their rights or privileges, and § 1985(3) creates a private right of action against "two or more persons . . . [who] conspire . . . for the purposes of depriving . . . any person . . . of the equal protection of the laws, or of equal privileges and immunities under the laws." *See Facey v. Dae Sung Corp.*, 992 F. Supp. 2d 536, 540 (D. Md. 2014) (quoting § 1985(3)). To state a claim under § 1985(3), a plaintiff must show: "(1) A conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy." *A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011) (citation omitted). Under § 1986, a person may be liable if he or she has the power to prevent an act prohibited by § 1985 and neglects or refuses to do so. *See* 42 U.S.C. § 1986. "A cause of action based upon § 1986 is dependent upon the existence of a claim under § 1985." *Trerice v. Summons*, 755 F.2d 1081, 1085 (4th Cir. 1985).

The Wallaces allege that the officer defendants conspired with each other and members

---

[15]    The court also notes that the claims in Counts III and VIII are duplicative of claims raised in other parts of the Complaint. (*See* Counts I and VII, 2d Am. Compl. ¶¶ 194–207, 250–55 (bringing deliberate indifference claims under the Fourteenth Amendment and Articles 24 and 26)).

of the BGF gang to facilitate the attack on Mr. Wallace. While "[t]hreadbare recitals" of a conspiracy do not state a claim, *Soc'y Without a Name,* 655 F.3d at 346–47, discovery must proceed on the failure to protect claims, *see supra* Part III, which implicate the officer defendants' alleged role in the attack. The court will thus not dismiss Counts IV and V at this time.

## VIII. First Amendment and Article 40 retaliation claims (Counts VI and IX)

In Counts VI and IX, the Wallaces claim that by retaliating against Mr. Wallace for reporting unconstitutional treatment, the officer defendants deprived Mr. Wallace of his free speech rights under the First Amendment (Count VI) and Article 40 of the Maryland Declaration of Rights (Count IX).[16] To establish a First Amendment retaliation claim, a plaintiff must demonstrate that: (1) he engaged in constitutionally protected speech; (2) the defendant's alleged retaliatory action adversely affected the plaintiff's protected speech; and (3) a causal relationship exists between the speech and the alleged retaliatory action. *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000) (citations omitted). Article 40 is read *in pari materia* with the First Amendment. *Pendergast v. State*, 99 Md. App. 141, 148 (1994).

The Wallaces allege that Mr. Wallace engaged in protected conduct when he reported to medical staff, to his attorney, and to a judge that he was subject to "unconstitutional behavior" at BCDC. (2d Am. Compl. ¶¶ 244–45; Opp'n at 58). The Wallaces further allege that the officer defendants retaliated against Mr. Wallace by "facilitating the attacks on Mr. Wallace," which "permanently chilled his ability to exercise his First Amendment rights." (2d Am. Compl. ¶ 246). Taking these allegations as true, the defendants argue that the Wallaces' claims nevertheless fail

---

[16]     To the extent that the Wallaces claim that the officer defendants deprived Ms. Wallace of her free speech rights, (*see* Opp'n at 58), these claims have not been sufficiently alleged, (*see* 2d Am. Compl. ¶¶ 243–49, 260–62 (alleging violations of Mr. Wallace's—but not Ms. Wallace's—rights under the First Amendment and Article 40)).

because they fail to plead a causal connection between the protected conduct and the officer defendants' alleged facilitation of the attack. (Mot. at 25–26). The court agrees. The Wallaces merely assert—without supporting factual allegations—that the officer defendants' conduct was motivated by a desire to retaliate against Mr. Wallace for reporting unconstitutional conduct. (*See* 2d Am. Compl. ¶¶ 31, 119, 244, 261). This is insufficient to state a claim for First Amendment retaliation. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[A] complaint [does not] suffice if it tenders naked assertions devoid of further factual enhancement." (cleaned up)). Accordingly, Counts VI and IX will be dismissed.

## IX.     State law tort claims (Counts X–XIV)

### A.  Immunity

The defendants argue that the state law tort claims against them—negligence (Count X), gross negligence (Count XI), civil conspiracy (Count XII), intentional infliction of emotional distress ("IIED") (Count XIII), and assault (XIV)—must be dismissed, as the defendants are immune from suit on these claims under Maryland law. Specifically, the defendants claim immunity under the Maryland Tort Claims Act ("MTCA"), which provides that state personnel "are immune from suit . . . and from liability in tort for a tortious act or omission that is within the scope of the public duties of the State personnel and is made without malice or gross negligence." Md. Code Ann., Cts. & Jud. Proc. § 5-522; *see also* Md. Code Ann., State Gov't §§ 12-101 (defining "state personnel"), 12-105 (state personnel have immunity from liability described in § 5-522(b)). Whether the defendants are entitled to MTCA immunity on Counts X–XIV thus turns on whether the Wallaces have adequately alleged that the defendants acted with malice or gross negligence.

Malicious conduct is "conduct characterized by evil or wrongful motive, intent to injure,

knowing and deliberate wrongdoing, ill-will or fraud." *Barbre v. Pope*, 402 Md. 157, 182 (2007) (citation and quotation marks omitted). Gross negligence is "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them." *Id.* at 187 (quoting *Liscombe v. Potomac Edison Co.*, 303 Md. 619, 635 (1985)). Taken as true, the allegations of the Second Amended Complaint support a plausible inference that the officer defendants, in effecting the transfer of Mr. Wallace to MDC so that he could be assaulted by BGF members, either acted with the intent to injure Mr. Wallace or with reckless disregard for his life. Accordingly, the officer defendants are not entitled to immunity under the MTCA.

The question remains whether Johnson is entitled to immunity under the MTCA. While Count XI (gross negligence) is asserted only against the officer defendants, it appears that Counts X (negligence), XII (civil conspiracy), XIII (IIED), and XIV (assault) are asserted also against Johnson. The only way the Wallaces may sustain these claims against Johnson is through a theory of supervisory liability, as she is not alleged to have participated in or witnessed the attack.[17] But as neither party has presented arguments regarding MTCA immunity from state law claims asserted via supervisory authority, the court will not address the issue here. Accordingly, the court assumes that Johnson is not immune from suit on Counts X, XII, XIII, and XIV.

---

[17]     In their Opposition, the Wallaces state that in addition to supervisory liability, Johnson should be held responsible for her "direct actions" of "ignoring the numerous complaints about Mr. Wallace's safety and well-being, and continually failing to correct or prevent any additional serious harm to Mr. Wallace." (Opp'n at 51). But, by their terms, Counts X, XII, XIII, and XIV allege more direct involvement in attacks on Mr. Wallace. In Count X, the Wallaces allege that the defendants "encourage[ed] and allow[ed] the brutal attack," (2d Am. Compl. ¶ 266); in Count XII, the Wallaces allege that the defendants conspired to "facilitate" the attack, (*id.* ¶ 284); in Count XIII, the Wallaces allege that the defendants intentionally inflicted emotional distress "by subjecting him to repeat attacks at the hands of other inmates," (*id.* ¶ 289); and in Count XIV, the Wallaces allege that the defendants "intended to cause, and did cause, Mr. Wallace to suffer apprehension of immediate battery," (*id.* ¶ 299). The Second Amended Complaint does not allege that Johnson personally engaged in this conduct; accordingly, she cannot be directly liable on Counts X, XII, XIII, and XIV.

### B. Negligence and gross negligence (Counts X and XI)

The defendants' only argument for dismissal of Counts X (negligence) and XI (gross negligence) is that the they possess immunity under the MTCA. Accordingly, Counts X and XI will not be dismissed.

### C. IIED (Count XIII)

The Wallaces allege that "Defendants intentionally inflicted emotional distress on Plaintiff by subjecting him to repeat attacks at the hands of other inmates, ensuring that the attacks were carried out and participating in covering up the attacks." (2d Am. Compl. ¶ 289). The tort of IIED requires four elements: (1) intentional or reckless conduct; (2) extreme and outrageous conduct; (3) a causal connection between the wrongful conduct and the emotional distress; and (4) severe emotional distress. *Harris v. Jones*, 281 Md. 560, 566 (1977). This tort is "rarely viable" and should be "used sparingly and only for opprobrious behavior that includes truly outrageous conduct." *Bagwell v. Peninsula Reg'l Med. Ctr.*, 106 Md. App. 470, 514 (1995) (quoting *Kentucky Fried Chicken Nat'l Mgmt. v. Weathersby*, 326 Md. 663, 670 (1992)). Nevertheless, as discovery will proceed on the failure to protect claims, *see supra* Part III, which implicate the alleged unconstitutionality of the defendants' actions, the court will allow the IIED claim to go forward at this time.

### D. Assault (Count XIV)

The tort of assault consists of two elements: (1) "the plaintiff must prove that he was threatened by a defendant who possessed the apparent present ability to carry out that threat," and (2) "the defendant's actions must have raised in the plaintiff's mind an apprehension of imminent bodily harm." *See Lee v. Pfeifer*, 916 F. Supp. 501, 505 (D. Md. 1996) (citing *Continental Casualty Co. v. Mirabile*, 52 Md. App. 387, 398 (1982)). The defendants argue that

this claim should be dismissed, as the Wallaces fail to allege any facts that the defendants threatened Mr. Wallace. The court agrees. While the Wallaces allege that Mr. Wallace was repeatedly threatened by *other inmates* who were members of BGF, they do not allege that *the defendants* made such threats. Accordingly, the Wallaces have failed to state an assault claim, and Count XIV will be dismissed against all defendants.

E. Civil Conspiracy (Count XII)

In Count XII, the Wallaces appear to assert a standalone tort claim of "civil conspiracy." But, as the defendants point out, "civil conspiracy is not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff." *Hoffman v. Stamper*, 385 Md. 1, 25 (2005) (citation and quotation marks omitted). In the Opposition, the Wallaces clarify that Count XII was not intended as a standalone cause of action, but rather as an "aggravating factor" of the assault claim. (Opp'n at 60). As the Wallaces fail to state a claim for assault, however, Count XII also will be dismissed.

**X.     Qualified Immunity**

The defendants argue that they are entitled to qualified immunity on all claims against them. The remaining claims against the officer defendants are Counts I and VII (failure to protect); IV and V (conspiracy to interfere with civil rights); X (negligence); XI (gross negligence); and XIII (IIED). The remaining claims against Johnson are Counts I and VII (failure to protect), X (negligence), and XIII (IIED). No claims remain against Moyer.

Pursuant to the doctrine of qualified immunity, even if a public official engages in unconstitutional conduct, he "may nevertheless be shielded from liability for civil damages if [his] actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citation

and quotation marks omitted). A "clearly established" right is violated when, "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (citations and quotation marks omitted).

The defendants argue that the Wallaces have failed to allege violations of clearly established rights. The court disagrees. At the heart of the remaining claims is the allegation that the defendants acted with deliberate indifference towards serious threats to Mr. Wallace's life, either by refusing to move Mr. Wallace to protective custody or by facilitating the December 18, 2014, attack. In holding that qualified immunity did not shield a correctional officer defendant from a prisoner's failure to protect claim, the Fourth Circuit explained:

> It has long been established that jail officials have a duty to protect inmates from a substantial and known risk of harm, including harm inflicted by other prisoners. . . . [W]e ha[ve] made it clear that a prison official acts with deliberate indifference when he ignores repeated requests from a vulnerable inmate to be separated from a fellow inmate who has issued violent threats which the aggressor will likely carry out in the absence of official intervention.

*Cox v. Quinn*, 828 F.3d 227, 239 (4th Cir. 2016) (internal citations and quotation marks omitted).[18] If the defendants did, in fact, engage in the alleged conduct, a reasonable official would have known that this conduct violated established law. Accordingly, the defendants are not entitled to qualified immunity on the remaining claims against them.

---

[18] While *Cox* involved a sentenced prisoner's Eighth Amendment failure to protect claim, the Fourth Circuit has recognized that a pretrial detainee may assert a failure to protect claim under the Fourteenth Amendment that is assessed under the same standard as its Eighth Amendment counterpart. *See Brown,* 240 F.3d at 388.

**CONCLUSION**

For the foregoing reasons, the defendants' motion to dismiss will be granted in part and denied in part. All claims will be dismissed against Moyer. Counts II, III, VI, VIII, IX, XII, and XIV will be dismissed as to all defendants. Counts I, IV, V, VII, X, XI, and XIII will not be dismissed. A separate order follows.

   3/30/20                                     /S/
Date                                            Catherine C. Blake
                                            United States District Judge