IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NICOLE WALLACE, *et al.*                    *

                                            *

v.                                          *          Civil Action No.   17-cv-3718

                                            *

BETTY JOHNSON, *et al.*                     *
                      .                     *

                            ******

**MEMORANDUM**

On December 28, 2014, while detained at the Baltimore City Detention Center ("BCDC")

pending trial on nonviolent criminal charges, Daquan Wallace suffered severe injuries from an

attack by other inmates. He remains significantly disabled. In December 2017, Mr. Wallace and

his mother Nicole Wallace, individually and as next friend, filed two lawsuits: one in Baltimore

City Circuit Court against the State of Maryland, its Department of Public Safety and Correctional

Services, and the Division of Pretrial Detention ("the State") alleging various state law claims, and

this suit in federal court against the former Warden of BCDC and other individual defendants

alleging federal claims under 42 U.S.C. § 1983 as well as state law claims.

The case in Baltimore City proceeded first to discovery and verdict. On September 24,

2019, a jury found the State liable for non-economic damages in the total amount of twenty-five

million dollars. (ECF 117-5 at 4; ECF 133-21, Ex. 20, at 4). No economic damages were sought.

On October 9, 2019, the Circuit Court entered a judgment of twenty-five million dollars for the

Wallaces against the state court defendants. (ECF 117-2 at 2). Post-judgment motions are pending

regarding the statutory cap on damages of $200,000. (ECF 117 at 8). Now pending in this case is

1

a motion for summary judgment (ECF 117) on behalf of the remaining individual defendants: former Warden Betty Johnson, and former BCDC correctional officers Tamara Patterson, Lisa Portee, and Jackens Rene.[1] The motion has been exhaustively briefed, and oral argument was heard on January 12, 2022. For the reasons set forth below, the motion will be granted as to Warden Johnson, but denied in part and granted in part as to Officers Patterson, Portee, and Rene.

## BACKGROUND

As both sides have summarized the facts based on the Second Amended Complaint (ECF 82), the court will do the same, stating only those necessary to outline the issues.[2] On September 3, 2014, Daquan Wallace was committed to Baltimore City Detention Center ("BCDC") pending trial on nonviolent criminal charges. (ECF 82 ¶ 164). While in detention, Mr. Wallace complained to his mother and officials that he was being targeted for rape and fights due to his refusal to join the Black Guerilla Family ("BGF") gang. (*Id.* ¶¶ 25, 27, 29). Despite numerous injuries from these fights and repeated requests to BCDC officials for protection, Mr. Wallace did not receive protective custody. (*Id.* ¶¶ 42-47). On December 18, 2014, Lieutenant Patterson directed Sergeant Portee to complete the paperwork to transfer Mr. Wallace from the Jail Industries ("JI") building where he was housed to the Men's Detention Center ("MDC"), a different dormitory for more dangerous offenders, citing false allegations that Mr. Wallace was extorting other detainees. (*Id.* ¶¶ 50, 52, 54-55, 57-59, 61, 66-69). During his transfer, which was not formally approved, Mr. Wallace was placed by Officer Rene in his cell with handcuffs on and not allowed to leave for dinner with his cellmate. (*Id.* ¶¶ 51, 74-78, 80, 85-87). BGF members from cells 3, 47, and 48 were also held back against BCDC policy. (*Id.* ¶¶ 87, 90-91, 121). Officer Rene was present when the

---

[1] Defendants Stephen Moyer and Ericka Shird have been dismissed.

[2] The alleged facts also are set forth in the court's earlier opinion ruling on the defendants' Motion to Dismiss. (ECF 96).

BGF members attacked Mr. Wallace, who was found unresponsive in his bunk with multiple head wounds. (*Id.* ¶¶ 97-98, 102, 106, 109, 118).

Mr. Wallace sustained a traumatic brain injury and a fracture to his inner eye socket, among other injuries, remaining comatose for almost a month after the attack. (*Id.* ¶¶ 143-44). As of the filing of the second amended complaint, Mr. Wallace's feeding and tracheostomy tubes had been removed, but he was unable to talk, walk, or write; remained on a ventilator; was confined to a chair; required 24-hour care; and underwent intensive daily therapy. (*Id.* ¶¶ 145, 160).

Based on these allegations, the Wallaces filed their two lawsuits. In state court, as noted, the Wallaces sued only the State defendants. While the individual defendants were not named, some of them were referenced in the complaint, and they were called as witnesses in the Baltimore City Circuit Court trial. Their actions, or inactions, were presented as the primary basis of the claims against the State. As set forth in the verdict sheet, the jury found the State defendants liable for failure to protect Mr. Wallace from violence in violation of the Maryland constitution as well as for violation of state constitutional rights generally; for negligent training and supervision of its employees and that the negligence of its employees caused injury to Mr. Wallace; but that the employees did not act in concert with the State or each other to cause Mr. Wallace to fear intentional threat of harm. The jury awarded ten million dollars in non-economic damages for violation of the state constitutional rights and fifteen million dollars in non-economic damages for the State's negligence. (ECFs 117-5, 133-21). Judgment initially was entered for $200,000, the limit of liability under the Maryland Tort Claims Act ("MTCA"), Md. Code Ann. Cts. & Jud. Proc. § 5-522(a)(5), and was then amended to reflect the full twenty-five million dollar verdict. (ECF 117-2, Ex. A). An appeal is pending. (ECF 133 at 5, *see also* Md. State Court Database, *Nicole Wallace, et al. v. State of Maryland, et al.*, Case No. 24C17006410, Doc. 93 available at:

https://casesearch.courts.state.md.us/casesearch/inquiryDetail.jis?caseId=24C17006410&loc=69 &detailLoc=CC).

In federal court, the Wallaces seek economic and punitive damages. (ECF 82 at 51). The remaining claims brought against all individual defendants include Count I, a Fourteenth Amendment failure to protect claim; Count VII, an Article 24 of the Maryland Declaration of Rights due process claim; Count X, a negligence claim, and Count XIII, an intentional infliction of emotional distress claim. (ECF 96 at 10-23). Remaining claims against defendants Patterson, Portee, and Rene include Counts IV and V, conspiracy to interfere with civil rights claims, and Count XI, a gross negligence claim. Counts II, III, VI, VIII, XII, and XIV were dismissed by the Court. (*Id.* at 25). The defendants first contend that res judicata bars this suit in its entirety.

**DISCUSSION**

## I.   **Claim Preclusion[3]**

Res judicata, also known as claim preclusion, "bars a party from relitigating a claim that was decided or could have been decided in an original suit," *Laurel Sand & Gravel, Inc. v. Wilson*, 519 F.3d 156, 161 (4th Cir. 2008). The Fourth Circuit has explained that "[t]he doctrine was designed to protect litigants from the burden of relitigating an identical issue with the same party or his privy and to promote judicial economy by preventing needless litigation." *Id.* at 161-62 (internal quotations and citation omitted). When considering the preclusive effect of a prior state court judgment, the federal court must give the state court judgment the same preclusive effect it would be given under the law of the state in which judgment was entered. *Migra v. Warren City*

---

[3] The defendants assert the res judicata defense in their first Answer (ECF 98 at 15), which was filed in response to the Second Amended Complaint (ECF 82).

*School Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984). This is so even where the second suit seeks to assert federal claims under 42 U.S.C. § 1983 that were not brought in state court. *Id.* at 84.

Under Maryland law, application of res judicata has three components:

(1) That the parties in the present litigation are the same or in privity with the parties in the earlier dispute; (2) that the claim presented in the current action is identical to the one determined in the prior adjudication; and (3) that there has been a final judgment on the merits.

*Laurel*, 519 F.3d at 162 (citing *Anne Arundel County Bd. of Educ. v. Norville,* 390 Md. 93, 108 (2005); *deLeon v. Slear*, 328 Md. 569, 580 (1992)). The parties do not dispute that the third prong is satisfied. The court finds that the second prong also is satisfied, as Maryland applies a "transactional" approach when analyzing whether the second suit presents the same claims. *See Kent County Bd. of Educ. v. Bilbrough*, 309 Md. 487, 499 (1987); *Gonsalves v. Bingel*, 194 Md. App. 695, 710 (2010). The first prong, whether the defendants are in privity, is a closer question.

All the remaining individual defendants were at the time of the attack on Mr. Wallace employees of the State, working at BCDC. Maryland courts have sometimes found employees to be in privity with their employers. *See, e.g.*, *deLeon*, 328 Md. at 588. Maryland courts also, however, have recognized circumstances where privity does not apply. *See Warner v. German*, 100 Md. App. 512, 522 (1994). And the Fourth Circuit has held in a suit brought under 42 U.S.C. § 1983 that "a government official in his official capacity is not in privity with himself in his individual capacity for purposes of res judicata." *Andrews v. Daw*, 201 F.3d 521, 526 (2000). In so holding, the Circuit relied in part on *Restatement (Second) of Judgments*, *id.* at 525, which is also relied on by Maryland state courts in analyzing issues of claim preclusion. *See, e.g.*, *Prince George's County v. Brent*, 414 Md. 334, 342, 342 n.9 (2010); *deLeon*, 328 Md. at 580.[4] The

---

[4] The Supreme Court treats the *Restatement (Second) of Judgments* as an authoritative statement of federal res judicata doctrine. *See, e.g.*, *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001).

*Andrews* court also cited to other federal Circuits which have reached the same conclusion. *See Andrews*, 201 F.3d at 526 (citing *Headley v. Bacon,* 828 F.2d 1272, 1279–80 (8th Cir. 1987); *Roy v. City of Augusta,* 712 F.2d 1517, 1521–22 (1st Cir. 1983)). The Fourth Circuit set forth these reasons:

> Because the real party in interest in an official-capacity suit is the entity, a plaintiff can only recover damages from the entity itself, in contrast to a personal-capacity suit, in which a plaintiff can seek a judgment against the official's personal assets. Furthermore, different legal theories of liability are required for the plaintiff, and different defenses are available to the defendant, in a personal-capacity action than in an official-capacity action. These differences indicate that a government official in his official capacity does not represent "precisely the same legal right" as he does in his individual capacity.

*Andrews*, 201 F.3d at 525. The Fourth Circuit reaffirmed this reasoning in *Brooks v. Arthur*, 626 F.3d 194, 203 (4th Cir. 2010); *see also Haskins v. Hawk*, 2013 WL 1314194, at *10-14 (D. Md. Mar. 29, 2013).[5]

It is true that many of the policy reasons supporting claim preclusion apply here: the plaintiffs, who could have brought all their claims in state court, instead have consumed the resources of the defendants and two courts so far, and there is some risk of what may be inconsistent verdicts. But this is not a case where the plaintiff lost in his first trial and seeks a second chance to prove claims that were decided against him. In any event, given the difference in defendants between the two cases, where only the State (and its agencies) were sued in state court for state law claims, and only certain individual defendants, in their individual capacities, are sued in federal court for federal (and related state law) claims, and considering the Fourth Circuit's

---

[5] Unpublished opinions are cited for the persuasiveness of their reasoning, not for any precedential value.

rulings in *Andrews* and *Brooks*, which are consistent with the *Restatement (Second) of Judgments* relied on by Maryland courts, res judicata does not bar the Wallaces' claims.[6, 7]

## II.    Judicial Estoppel

The defendants also argue that certain claims should be barred under the doctrine of judicial estoppel. A party may be estopped from asserting an argument if (1) it is seeking to adopt a factual position that is inconsistent with the position taken in prior litigation; (2) the prior inconsistent position was accepted by the first tribunal; and (3) the prior position was intentional, and not taken through mistake or inadvertence, such that the party sought to be estopped must have "intentionally misled the court to gain unfair advantage." *Lowery v. Stovall*, 92 F.3d 219, 224 (4th Cir. 1996). Primarily, they argue that the plaintiffs in the state court case pled and obtained relief on a theory of negligence, rather than gross negligence or intentional misconduct, thus allowing for recovery against the State under the MTCA. But estoppel applies to inconsistent assertions "of fact rather than law or legal theory," *id.* at 224, and, in any event, it would not necessarily be inconsistent for the State to be found negligent and one or more of the individual defendants be found to have acted with gross negligence. Nor is there any indication the Wallaces sought to mislead either court.

---

[6] Two unpublished cases relied on by the defendants, *Cognate Bioservices v. Smith*, 2016 WL 915506 (D. Md. March 10, 2016), and *Savary v. Cody Towing and Recovery, Inc.*, 2011 WL 337345 (D. Md. January 31, 2011), did not involve claims against government officials in their different capacities and are thus distinguishable.

[7] The Wallaces also contend that, even if claim preclusion would otherwise bar litigation of their present claims, they should be allowed to proceed under the Supreme Court's decision in *England v. Louisiana State Board of Medical Examiners*, 375 U.S. 411 (1964). Under the *England* doctrine, as affirmed in Section 26 of the *Restatement (Second) of Judgments*, a plaintiff may validly reserve federal claims in a state court proceeding so long as either the parties have agreed in terms or in effect that the plaintiff may split his claims; or the court in the first action has expressly reserved the plaintiff's right to maintain the second action. *Restatement (Second) of Judgments* § 26(1); *see also England*, 375 U.S. at 467-68 (discussing only the court's reservation of claims, not parties' agreement); *Promovision Int'l Films, Ltd. v. Trapani*, 744 F.2d 1063, 1064 n.1 (4th Cir. 1984) ("Any party may make on the state record his reservation to the disposition of the entire case by the state courts, by informing them that he is exposing his federal contentions only as a matter of information, and that he intends to return to the federal court for disposition of the federal contentions"). The parties in this case dispute whether the Wallaces sufficiently preserved their federal claims for federal court, and it is not necessary to reach this issue.

### III.    Collateral Estoppel

Further, as to certain claims (Counts IV, V, and XI), the defendants assert collateral estoppel, or issue preclusion. Claim preclusion gives dispositive effect to a prior judgment if the new claim could have been litigated in the prior action, even though it was not. Issue preclusion bars relitigation only of an issue identical to that "actually determined and necessarily decided" in the prior action. *In re Microsoft Corp. Antitrust Litig.,* 355 F.3d 322, 326 (4th Cir. 2004).

The state court jury in the Wallaces' case did not render a verdict on any claim of conspiracy to violate Mr. Wallace's constitutional rights, rather, the language presented was whether employees were "acting in concert" to commit a battery or an assault. (ECF 133-32, Ex. 31 (Def. State Ct. Proposed Verdict Sheet); ECF 133-21, Ex. 20 (Verdict Sheet) at 3; ECF 133-26, Ex. 25 (Trial Tr., Sept. 23, 2019, Jury Instructions) at 12-13 (defense counsel framed the conspiracy count as a conspiracy to assault or batter), 229). No constitutional conspiracy claim was ever presented to the state court jury. As conspiracy to be deliberately indifferent to the risk of an attack by other detainees is materially different from a conspiracy to physically assault or batter someone, the plaintiffs are not precluded by collateral estoppel from bringing these constitutional conspiracy claims. Nor does the general verdict of negligence against the state conclusively determine the issue of gross negligence as to the individual defendants in this case.

For each of the Wallaces' seven remaining claims, the court is tasked with determining whether a genuine dispute as to any material fact exists that entitle the plaintiffs to proceed to trial. Fed. R. Civ. P. 56(a). As the court has found that the doctrines of claim preclusion, judicial estoppel, and issue preclusion do not apply, each argument as to each of the remaining claims that the individual defendants raise will be analyzed in turn.

### IV.    Legal Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247–48. The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam), and draw all reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)). The relevant inquiry is whether the evidence "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014) (quoting *Anderson*, 477 U.S. at 255).

## V.    Failure to Protect Claims (Counts I and VII)

Counts I and VII of the Wallace's Second Amended Complaint are best characterized as "failure to protect" claims brought under the Fourteenth Amendment and Articles 24 and 26 of the Maryland Constitution, respectively. *See Bell v. Wolfish*, 441 U.S. 520, 534–36 (1979) (holding

9

that "when an aspect of pretrial detention that is not alleged to violate any express guarantee of the Constitution is challenged," the only cognizable Fourteenth Amendment due process claim is a challenge to "conditions or restrictions of pretrial detention that . . . amount to punishment of the detainee"). "[A] prison official's deliberate indifference to a substantial risk of serious harm" amounts to such unconstitutional punishment. *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001) (internal quotation marks omitted).[8]

A pretrial detainee's Fourteenth Amendment failure to protect claim is analyzed under the two-pronged inquiry set forth in *Farmer v. Brennan*, 511 U.S. 825 (1994). *See Brown*, 240 F.3d at 388–90. First, a pretrial detainee must show that he is being detained under conditions posing a "substantial risk" of "objectively, sufficiently serious" harm. *Brown*, 240 F.3d at 389 (citations omitted). Second, the detainee must show that the government official acted with "deliberate indifference." *Id*. (citations omitted).

The court will also analyze the Wallaces' state constitutional failure to protect claim (Count VII) using the *Farmer* framework. Article 24 of the Maryland Declaration of Rights provides to pretrial detainees at least as much due process protection as the Fourteenth Amendment, *Smith v. Bortner*, 193 Md. App. 534, 553 (2010) (citing *Koshko v. Haining*, 398 Md. 404, 443–44 (2007)), and "Supreme Court interpretations of the Fourteenth Amendment function as authority for interpretation of Article 24." *Pitsenberger v. Pitsenberger*, 287 Md. 20, 27 (1980) (citations omitted).[9]

---

[8] In *Brown*, the Fourth Circuit applied the Supreme Court's analysis in *Farmer v. Brennan*, 511 U.S. 825 (1994), an Eighth Amendment failure to protect case, to a pretrial detainee's claim for Fourteenth Amendment failure to protect him from a risk of suicide. *See* 240 F.3d at 388–90. In so doing, the Fourth Circuit noted that the "deliberate indifference" standard under either the Eighth or Fourteenth Amendments is the same. *Id*. at 388.

[9] To the extent that Count VII purports to bring a claim under Article 26 of the Maryland Constitution, the court does not find evidence in the record indicative of any violation of this Article. Article 26 of the Maryland Declaration of Rights is construed *in pari materia* with its federal analog, the Fourth Amendment, which protects individuals from unreasonable searches and seizures. *See, e.g.*, *Dent v. Montgomery County Police Dept.*, 745 F. Supp. 2d 648, 661 (D.

The defendants argue that the Wallaces have not provided evidence sufficient to withstand a motion for summary judgment for either prong of the *Farmer* test. The court will address the claims against each defendant in turn.

### a)  Warden Johnson

The Wallaces contend that Warden Johnson was both directly responsible and responsible in her supervisory capacity for acting with deliberate indifference to the safety of Mr. Wallace. The defendants dispute both grounds for liability.

### i.    Direct Liability

The Wallaces first claim that the record, viewed in the light most favorable to the plaintiffs, demonstrates that Warden Johnson was directly liable for failing to protect Mr. Wallace by acting with deliberate indifference to his safety.[10] The proffered evidence, however, is insufficient to support direct liability. In support of the claim, the Wallaces proffer Ms. Nicole Wallace's statement that she spoke to someone that she believed to be Warden Johnson about her son getting beaten up, but was "talking [mainly] to [Lt.] Patterson," and that nothing was done after this call. (ECF 117-8, Ex. D, at 114 L 7-15; 115 L 3-15). There is no evidence that Warden Johnson promised to move Mr. Wallace to protective custody after this call. The assertion that Warden Johnson "should have known" about Mr. Wallace's facial injury is speculative and does not identify why the warden of a large institution would be expected to see and remember the physical conditions of every inmate under her supervision, nor do the Wallaces provide evidence that Warden Johnson ever actually saw Mr. Wallace with his facial injuries. (*Id.* at 45 L 12-18).

---

Md. 2010). As this subclaim is irrelevant, the court analyzes Count VII as only being brought under Article 24 of the Maryland Constitution.

[10] In its previous memorandum opinion on the defendants' motion to dismiss, the court determined that Warden Johnson could not be held directly liable for Counts X and XIII. (ECF 96 at 21 n.17).

Moreover, the Wallaces' evidence that, had Warden Johnson acted differently, Mr. Wallace would not have been injured, is speculative and conclusory. (*Id.* at 115 L 1-2 (only providing Ms. Wallace's subjective belief that, "if [Warden Johnson] did [act], [Mr. Wallace] wouldn't be like this")). A reasonable jury could not conclude from the evidence provided that Warden Johnson had actual, personal knowledge of the risk posed to Mr. Wallace by the transfer or for failing to move him to protective custody.

ii. **Supervisory Liability**

As with direct liability, the court concludes that the Wallaces have failed to meet their evidentiary burden with respect to Warden Johnson's supervisory liability for Mr. Wallace's constitutional injuries. Supervisory liability under § 1983 may not be based on vicarious liability for a subordinate's commission of a constitutional violation. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (holding a public official "may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*"); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). Rather, to survive summary judgment, a plaintiff must demonstrate that: (1) a supervisor had actual or constructive knowledge that a subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff, (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged practices engaged in by the subordinate; and (3) there was an affirmative causal link between the supervisor's inaction and the constitutional injury suffered by the plaintiff. *Randall v. Prince George's Cty., Md.*, 302 F.3d 188, 206 (4th Cir. 2002) (quoting *Shaw v. Stroud*, 13 F.3d at 799).

The plaintiffs have failed to adequately support the first element of the cause of action: that Warden Johnson had actual or constructive knowledge that a subordinate was engaged in conduct

12

that posed a pervasive and unreasonable risk of constitutional injury to someone like Mr. Wallace. Ms. Johnson had been Warden of BCDC for just two months prior to the incident that injured Mr. Wallace. (ECF 117-9, Ex. E, at 20, L. 2-3). While she was aware of various security issues at the facility, there is not evidence that she was aware of circumstances posing an unreasonable risk of harm to Mr. Wallace.

The second element of supervisory liability is also unsupported by the evidence provided, which fails to demonstrate an inadequate response by Warden Johnson to reports of gang activity, or any tacit authorization of staff or inmates committing or permitting violent acts. Warden Johnson stated that her responsibilities included overseeing a large facility with a chain of command, and that she was responsible for disciplining employees, budgeting, maintenance, and support services. (*Id.* L 4-11, 19-25). Warden Johnson also oversaw an investigative unit that met with her at least once per week to inform her of the "climate of the facility and any information [she] may have needed to know." (*Id.* at 21, L 11-20). Warden Johnson reviewed investigatory reports regarding gang and other criminal activity within the facility and reported such information up her chain of command to have it investigated. (*Id.* at 21, L 21-25; at 22, L 1-4; at 27, L 3-13). Employees suspected of corruption were assigned to posts outside the facility without contact with detainees while an investigation into their conduct took place. (*Id.,* at 27, L. 18-24).

The plaintiffs fail to provide other proof that Warden Johnson was, in fact, responding inadequately to reports of improper behavior or gang activity in the two months she was warden before Mr. Wallace suffered his injuries. While the Wallaces offer evidence that Lt. Patterson sent a memorandum detailing Mr. Wallace's injuries to the Warden, it also stated that "he was not in fear for his safety." (ECF 133-10, Ex. 9, Patterson Dep. at 83-84). Based on this memorandum, Warden Johnson would not have had reason to act in response to this earlier injury to Mr. Wallace.

13

Similarly, the Wallaces' concerns with the lack of discipline by Warden Johnson of the correctional officers allegedly involved in Mr. Wallace's injury is not relevant to this analysis, as the disciplinary response to the event fails to demonstrate knowledge of risk, response to mitigate it before an injury occurs, or the causal link between inaction and the plaintiff's injury. *See Randall*, 302 F.3d at 206. Accordingly, because the evidence proffered is not sufficient to establish either supervisory or direct liability, Warden Johnson will be granted summary judgment on Counts I and VII.

### b) Lieutenant Patterson and Sergeant Portee

The *Farmer* test also applies to individual corrections officers. *See, e.g.*, *Brown v. N.C. Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010).

Officers Patterson and Portee both worked at the Jail Industries Building for several years prior to Mr. Wallace's injury. (ECF 117-11, Ex. G., Patterson Dep., at 52, L 8-10; ECF 117-12, Ex. H., Portee Dep., at 9, L 12-20; 10, L 15-16). On December 18, 2014, Officers Patterson and Portee both signed a transfer form, with Lt. Patterson approving the request submitted by Sgt. Portee, to move Mr. Wallace from the "500 dorm" of the JI building to a cell in the MDC building across Madison Street. (ECF 117-11, Ex. G, at 66 L 18-19; ECF 117-12, Ex. H, at 31 L 21, 32 L 1; ECF 117-13, Ex. I, Transfer of Housing Assignment Sheet). This decision occurred after Ms. Wallace called the jail three to four times to report the other inmates' attacks on Mr. Wallace and that he feared for his life there. (ECF 133-5, Ex. 4, at 33-34, 70). After one of these calls, Lt. Patterson wrote a report that Mr. Wallace had an injury to his eye which required her to send him for medical treatment. (ECF 133-25, Ex. 24 (Tr. Tr., Sept. 16, 2019, Lt. Patterson), at 282-283). As the damage to Mr. Wallace's face was clearly visible, Sgt. Portee, who was on his floor, would have seen his medical condition as well. As long-time employees of the facility, officers Patterson

and Portee were aware that the MDC housed more violent offenders with higher security classifications than the "better" dormitory-style JI building. (ECF 133-10, Ex. 9, Patterson Dep., at 77-80).

The Wallaces also identify circumstantial evidence that suggests Lt. Patterson fabricated the reason for transferring Mr. Wallace from the JI to MDC building. Lt. Patterson claims that another Correctional Officer complained that Mr. Wallace had been disrespectful and did not listen to officers. (ECF 133-10, Ex. 9, at 65). But she does not identify which officer informed her, nor did she provide any details about the conduct that was disrespectful, instead hypothesizing that he could have overstayed his allotted time in the TV room. (*Id.* at 65-72). Sgt. Portee, however, reports that Lt. Patterson directed her to sign the transfer paperwork because Mr. Wallace had extorted other inmates for commissary and phone privileges. (ECF 133-4, Ex. 3, at 129). In her deposition, Lt. Patterson has denied that Mr. Wallace ever extorted other inmates or that it was the reason for his transfer. (ECF 133-10, Ex. 9, at 99). The Wallaces have provided numerous pieces of evidence that suggest either reason, extortion or disrespect, should result in segregation, not transfer to the MDC. (*See, e.g.*, ECF 133-27, Ex. 26, Sept. 17, 2019, Warden Johnson; ECF 133-13, Ex. 12, Johnson Dep. at 35-36; ECF 133-6, Ex. 5, Officer Shird Dep., at 56). Additionally, Lt. Patterson did not claim to have issued Mr. Wallace a disciplinary infraction for the alleged misconduct, as would be expected punishment for such behavior. (*Id.*). In the State court case, Sgt. Portee also testified that, had Mr. Wallace actually been involved in extortion, he should have received a disciplinary ticket, but that she had not seen any such documentation. (ECF 133-27, Ex. 26, Tr. Tr., Sept. 17, 2019, Sgt. Portee).

The transfer form in question had a line for shift commander approval that contained no signature. (ECF 133-12, Ex. 11, Transfer Form). The form states that it is "void unless signed by

Shift Commander or Operation Captain when applicable." (*Id.*; ECF 133-3, Ex. 2, Officer Moore Dep. at 52-54). Officer Portee admitted that the transfer should not have happened, and rather, that she should and "would have" questioned it because of the missing signature. (ECF 133-4, Ex. 3, Portee Dep., at 70-71). She also admitted that, other than in the case of Mr. Wallace, she was not aware of other transfers ever being performed without the shift commander's signature on the form. (ECF 133-4, Ex. 3, at 77).

Such facts, in combination, could lead a reasonable juror to conclude that Officers Patterson and Portee falsified the transfer paperwork in order to move Mr. Wallace to the MDC, a location where his safety was in greater jeopardy than in the dormitory-style JI building, thus demonstrating the knowledge of and deliberate indifference to the danger posed to Mr. Wallace by the transfer under *Farmer* and *Brown*. Summary judgment will thus be denied to Officers Patterson and Portee on counts I and VII.

**c)   Officer Rene**

Like Officers Patterson and Portee, Officer Rene similarly contends that the record fails to identify that he had any awareness that Mr. Wallace was in danger prior to the assault, or that he acted with deliberate indifference to any such knowledge. The evidence presented by the Wallaces, however, could convince a jury to conclude otherwise.

First, there are several facts that suggest Officer Rene was involved in the irregular and unpermitted transfer of Mr. Wallace from the JI building to the MDC. Officer Rene worked the "A Shift" in the morning at JI with Officers Patterson and Portee, then was scheduled to work the "B Shift," alone, in G Section of the MDC that afternoon, placing him on both the sending and receiving ends of Mr. Wallace's transfer. (ECF 133-2, Ex. 1, at 103-04; ECF 133-11, Ex. 10, JI Logbook Page 12/18/14).

16

Officer Rene admitted that Shift Commander Moore was supposed to have signed the transfer paperwork, but that her signature was missing on the documentation. (ECF 133-2, Ex. 1, at 73). In her deposition, Warden Johnson stated that Officer Rene "should not have accepted this form without it being signed by the shift commander," and that the person initiating the transfer and the person accepting the detainee (here, both being Officer Rene) should have been reprimanded for engaging in the unapproved transfer. (ECF 133-13, Ex. 12, at 40-42, 72). The transfer officer's signature, another necessary item on the form, was also illegible where it is usually written clearly, according to Sgt. Portee. (ECF 133-4, Ex. 3, at 53-54, 57; ECF 133-13, Ex. 12, at 77).

Once Mr. Wallace arrived at his cell, Officer Rene continued to act contrary to facility policy. Officer Rene was the sole officer on the tier in MDC during dinnertime when Mr. Wallace remained in his cell and was attacked. (ECF 133-2, Ex. 1, Rene Dep., at 103-04). Officer Rene violated policy by allowing Mr. Wallace and three other detainees to remain in their cells during dinner, which was served over the course of twenty minutes, instead of keeping the tier's cell doors empty, closed, and locked over dinnertime. (ECF 133, Ex. 3, Moore Dep., at 98-100, 124). Mr. Wallace's new cellmate at the MDC, Joseph Beatty, reported that when Officer Rene received Mr. Wallace, Mr. Beatty was ordered "to leave and go downstairs for dinner, to the day room first," after which he "went to dinner" while Mr. Wallace remained in his cell. (ECF 133-14, Ex. 13 ¶¶ 6-7). Officer Rene admitted this violation occurred without noting this in the BCDC logbook. (ECF 133-2, Ex 1, at 105-06, 111).

During dinnertime, at 7:34 p.m., Officer Rene recorded in the logbook that he physically walked the tier, looking in each cell. (ECF 133-2, Ex. 1, at 111-12). He testified that during these rounds, he would "have been able to see whether or not [Mr. Wallace] was in poor medical

condition" from his vantage point outside Mr. Wallace's cell. (ECF 133-2, Ex. 1, at 170). He reported no disturbances, however, instead stating that the "security round [was] conducted and all appear safe and secure." (*Id.* at 111-112). Within a few minutes of this log entry, Mr. Beatty attests to returning to his and Mr. Wallace's cell to find Mr. Wallace face-down and unconscious on his bunk inside the cell; he observed blood on the wall of the cell, and reported his observations immediately to an officer. (ECF 133-3, Ex. 2, at 67-68; ECF 133-14, Ex. 13 ¶¶ 13-15). The BCDC medical unit subsequently found that Mr. Wallace had "trauma to the right side of his head, his bottom lip, and the back of his head contained sections of blood." (ECF 133-15, Ex. 14, Criminal Investigation Report, at 3). During the officers' investigation of the incident, investigators found a t-shirt, orange shirt and blue jeans, all with blood on them, in cells 47 and 48, where Officer Rene admitted other inmates stayed behind during dinner. (ECF 133-3, Ex. 2, at 129, ECF 133-16, Ex. 15, Email Between BCDC Detectives). Officer Rene admitted in his deposition that, hypothetically, "the only way [inmates from cells 3, 47, and 48] would come out [is] if I let them out," and agreed that he "would have had to have unlocked Daquan's cell" for them to enter it. (ECF 133-2, Ex. 1, at 80, 146-47). Officer Rene also admitted that he knew a number of BGF gang members resided in the facility. (*Id.* at 147).

Officer Rene claims that, when he became aware of the group gathering near Wallace's cell, he acted by calling for assistance, that no witness places him at Mr. Wallace's cell during the attack, and that Mr. Wallace went to dinner and was only attacked upon return from the dining hall. These are, however, simply other purported facts for a jury to consider when determining whether Officer Rene acted with deliberate indifference to Mr. Wallace's risk of injury. Considering the genuine disputes of material fact, and the evidence proffered in the light most favorable to the plaintiff, the court will deny Officer Rene summary judgment on counts I and VII.

## VI.     Conspiracy Claims (Counts IV and V)

In Counts IV and V, the Wallaces allege that Officers Rene, Patterson, and Portee engaged in a conspiracy to violate Mr. Wallace's civil rights in violation of 42 U.S.C. § 1985 (Count IV) and § 1986 (Count V).[11] Section 1985 prohibits a conspiracy to deprive persons of their rights or privileges, and § 1985(3) creates a private right of action against "two or more persons . . . [who] conspire . . . for the purposes of depriving . . . any person . . . of the equal protection of the laws, or of equal privileges and immunities under the laws." *See Facey v. Dae Sung Corp.*, 992 F. Supp. 2d 536, 540 (D. Md. 2014) (quoting § 1985(3)). To state a claim under § 1985(3), a plaintiff must show: "(1) A conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy." *A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011) (citation omitted). Under § 1986, a person may be liable if he or she has the power to prevent an act prohibited by § 1985 and neglects or refuses to do so. *See* 42 U.S.C. § 1986. "A cause of action based upon § 1986 is dependent upon the existence of a claim under § 1985." *Trerice v. Summons*, 755 F.2d 1081, 1085 (4th Cir. 1985).

While the plaintiffs have proffered at least circumstantial evidence of a conspiracy among the three officers, they have offered nothing to show it was motivated by an invidiously discriminatory animus. Accordingly, summary judgment will be granted on these claims.

## VII.    Qualified Immunity (Counts I, IV, V)

The individual defendants next argue that they are entitled to qualified immunity with respect to the Wallace's Due Process § 1983 claim (Count I) and Civil Rights Act claims (Counts

---

[11] Warden Johnson is not among the defendants accused of conspiracy.

IV and V). Pursuant to the doctrine of qualified immunity, even if a public official engages in unconstitutional conduct, he "may nevertheless be shielded from liability for civil damages if [his] actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quotation omitted). A "clearly established" right is violated when, "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quotation omitted).

Without identifying any specific facts, the individual defendants assert that the record establishes that they did not violate Daquan Wallace's Fourteenth Amendment rights. The court disagrees. The Wallaces' Fourteenth Amendment and Civil Rights Act claims rest on the allegation that the defendants acted with deliberate indifference towards serious threats to Mr. Wallace's life, either by refusing to move Mr. Wallace to protective custody or by facilitating the December 18, 2014, attack. As of 2014, a reasonable official would have known that they have "a duty to protect inmates from a substantial and known risk of harm, including harm inflicted by other prisoners." *Cox v. Quinn*, 828 F.3d 227, 239 (4th Cir. 2016); (*See* ECF 96, Mem. on Mot. to Dismiss, at 24). And as stated above, when the record is viewed in the light most favorable to the plaintiffs, a reasonable jury could conclude that each individual defendant acted with deliberate indifference to a serious risk of harm in violation of Mr. Wallace's rights. Therefore, the defendants are not entitled to qualified immunity.

## VIII.    Remaining State Tort Claims

The defendants next contend that they should be granted summary judgment with respect to the remaining state law tort claims of negligence (Count X), Gross Negligence (Count XI), and IIED (Count XIII).

a) **Statutory Immunity from Suit (Counts X and XIII)**

The defendants argue that they are entitled to summary judgment on two of the remaining state law tort claims against them: negligence (Count X) and intentional infliction of emotional distress ("IIED") (Count XIII) because they are immune from suit on these claims under Maryland law. Specifically, the defendants claim immunity under the MTCA, which provides that state personnel "are immune from suit . . . and from liability in tort for a tortious act or omission that is within the scope of the public duties of the State personnel and is made without malice or gross negligence." Md. Code Ann., Cts. & Jud. Proc. § 5-522; *see also* Md. Code Ann., State Gov't §§ 12-101 (defining "state personnel"), 12-105 (state personnel have immunity from liability described in § 5-522(b)).[12] Whether the defendants are entitled to MTCA immunity on Counts X and XIII thus turns on whether a reasonable jury may conclude from the record that the defendants acted with malice or gross negligence.

Malicious conduct is "conduct characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud." *Barbre v. Pope*, 402 Md. 157, 182 (2007) (internal quotation marks omitted). Gross negligence is "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them." *Id.* at 187 (quoting *Liscombe v. Potomac Edison Co.*, 303 Md. 619, 635 (1985)).

i. **Negligence (Count X)**

---

[12] The "scope of the public duties of the State personnel" for purposes of statutory immunity generally is coextensive with the common law concept of scope of employment under the doctrine of respondeat superior. *Larsen v. Chinwuba*, 377 Md. 92, 105 (2003) (internal quotation marks omitted). As the defendant officers' alleged tortious conduct involving the transfer of Mr. Wallace occurred while they were on duty in their roles as corrections officers, this element of MTCA immunity has been met.

MTCA immunity bars the Wallaces' negligence claim, as garden-variety negligence is definitionally not committed with malice. *See* Negligence, *Black's Law Dictionary* (11th ed. 2019) (defining negligence as ". . . any conduct that falls below the legal standard established to protect others against unreasonable risk of harm, except for conduct that is intentionally, wantonly, or willfully disregardful of others' rights"). Accordingly, the defendants' motion summary judgment will be granted with respect to Count X.

### ii.   Intentional Infliction of Emotional Distress (Count XIII)

As statutory immunity in Maryland is conferred only for the tortious conduct of state employees committed without malice or gross negligence, sufficient proof of malice defeats this defense. Because recklessness or intentionality on the part of the tortfeasor is an element of IIED under Maryland law, *see Harris v. Jones*, 281 Md. 560, 566 (1977), statutory immunity does not definitionally protect state personnel who commit the tort. *See* Md. Code Ann., Cts. & Jud. Proc. § 5-522. The court must therefore determine whether the claim is sufficiently supported by evidence to survive the defendants' motion for summary judgment.

The tort of IIED has four elements: (1) intentional or reckless conduct; (2) extreme and outrageous conduct; (3) a causal connection between the wrongful conduct and the emotional distress; and (4) severe emotional distress. *Harris*, 281 Md. at 566. The defendants argue that the "extreme and outrageous" element has not been met given this high standard. While IIED claims are "rarely viable," *see Respess v. Travelers Cas. & Sur. Co., of Am.,* 770 F. Supp. 2d 751, 757 (D. Md. 2011), intentionally placing another person at risk of grievous bodily injury at the hands of other detainees is among those acts could be found to be extreme and outrageous, and the individual defendant officers Patterson, Portee, and Rene will not be granted summary judgment.

22

The Wallaces, however, have failed to adequately support their claim of IIED against Warden Johnson, and she will be granted summary judgment on Count XIII.[13]

### b) Gross Negligence (Count XI)

The Wallaces bring the remaining count of gross negligence against Officers Patterson, Portee, and Rene. Apart from the argument that collateral estoppel bars this claim, addressed above, the defendant officers only contest that the Wallaces failed to produce sufficient facts to proceed with this claim. As the court has, however, found the Wallaces to have identified enough evidence to support their deliberate indifference and IIED claims which each require at least as much intentionality as gross negligence, summary judgment will not be granted with respect to Count XI.

### CONCLUSION

For the reasons stated herein, the court will Grant in part and Deny in part Warden Johnson, Officer Rene, Sgt. Portee, and Lt. Patterson's motion for summary judgment.

A separate Order follows.

3/31/22
_____
Date

_____
                                    /S/
_____
Catherine C. Blake
United States District Judge

---

[13] The Wallaces argue that Warden Johnson was grossly negligent because she failed to discipline the defendant officers after the attack on Mr. Wallace. (*See* ECF 133 at 46). A lack of discipline of the officers involved after the incident occurred, however, during ongoing investigation and litigation, is not proof of intent to cause severe emotional distress.